Reilly Tar and Chemical Corporation (Now The Reilly Corporation), Appellant, v. Francis J. Lewis, Appellee.

Gen. No. 40,458.

460

Opinion filed October 25, 1939. Rehearing denied November 9, 1939.

W. M. KEELEY and ROYAL W. IRWIN, both of Chicago, for appellant.

A. B. MANION, of Chicago, and HAL M. STONE, for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.
On April 24, 1933, plaintiff filed its declaration against Francis J. Lewis and William H. Lewis. On June 25, 1936, plaintiff, by leave of court, filed its amended declaration consisting of three counts. In the amended declaration the cause was discontinued as to William H. Lewis. Thereafter, Francis J. Lewis remained the sole defendant. The action at law was upon a contract, whereby it was alleged that defend-

ant agreed to pay one-half of certain income taxes claimed by the United States government against plaintiff and defendant, upon settlement of the claims, and that settlement was accordingly made.

The first count, after stating the preliminary facts and transactions, averred that "on, to-wit: May 25, 1928, before determination or settlement of the tax liabilities hereinabove referred to of defendant or of the plaintiff, but in contemplation of such settlement and to equalize the burden of payment in connection therewith, an agreement was made and entered into between the plaintiff on the one hand, and defendant, F. J. Lewis, on the other hand, whereby it was agreed that in connection with the settlement of such tax liabilities then in controversy, the said F. J. Lewis and W. H. Lewis on their part and the plaintiff on its part would each bear and pay one-half of the aggregate amount of any additional taxes and interest assessed against the said F. J. Lewis and W. H. Lewis on the one hand, and against the plaintiff on the other hand, pursuant to such settlement, if made; and that the said F. J. Lewis and W. H. Lewis would reimburse the plaintiff, and the plaintiff would reimburse the said F. J. Lewis and W. H. Lewis for any such additional taxes and interest thereon assessed and paid by it or them in excess of one-half of such aggregate amount, subject however to the limitation that the amount to be paid pursuant to said agreement by the said F. J. Lewis and W. H. Lewis exclusive of interest, should not exceed $315,000.00, and that the amount to be paid pursuant to said agreement by the plaintiff exclusive of interest should not exceed $315,000.00. The said parties therein further agreed that no settlement of the said tax liability then in controversy would be made unless, therein, the deficiency assessments against said F. J. Lewis and W. H. Lewis and against plaintiff corporation theretofore made from which ap-

peals had been filed and docketed with the United States Board of Tax Appeals were settled without penalties being assessed thereupon against said F. J. Lewis and W. H. Lewis; and with an agreement with the Government that the amounts of the said check transactions of the years 1912 to 1920, to-wit: $1,579,100.91, if taxed by the Government as dividends for said years would not be taxed as income of said individuals or either of them for the year 1927, in connection with the transfer of assets of plaintiff corporation to defendant F. J. Lewis, referred to in paragraph 5 of this declaration. The said agreement was orally made by the said F. J. Lewis, defendant herein, and he, the said F. J. Lewis then offered and promised and agreed to perform the said agreement and to make and cause to be made the payments of money required in such performance; and the said agreement was orally made on behalf of plaintiff by the persons then acting in the interests of plaintiff corporation; and, in reliance upon the said offer and promise of said F. J. Lewis, plaintiff corporation thereupon and thereafter accepted the said offer and adopted the said agreement and acted in reliance thereupon in making the said settlement and in making payment of the deficiency taxes agreed upon in the said settlement as hereinafter in this declaration recited; and plaintiff corporation would not have made the said settlement, on its part, nor waived its claim that the invested capital of plaintiff had been restored as hereinabove referred to, nor made payment of the said deficiency taxes, excepting in reliance upon the said promise to the defendant, F. J. Lewis. On, to-wit: May 25, 1928, a written memorandum of the said offer and agreement then and theretofore made as hereinabove recited was signed by the said defendant, F. J. Lewis, and by G. G. Guthrie Hunter, the latter then being Vice President of the corporation then holding all of the issued and

outstanding capital stock of the plaintiff, and the said written memorandum was in words and figures as follows, to-wit:

'The Washington

Washington, D. C.

'In connection with the tax settlement now pending, any taxes assessed against either the Lewis's or the Company shall be paid 50% by the Lewis's and 50% by the Company, provided that the Lewis's shall not pay more than $315,000.00 plus interest, and the Company shall not pay more than $315,000.00 plus interest. It is understood however, that the dividend if taxable in prior years is not taxable in 1927, and vice versa.

'This agreement shall not be in effect if no settlement is reached, and the case has to go before the Board of Tax Appeals.

'May 25, 1928.

(Signed)      G. G. Guthrie Hunter,
*Vice President*
*International Combustion Engineering Corporation.*
F. J. Lewis.'

The said memorandum in writing set out by copy in paragraph 11 of this declaration was written upon stationery of a hotel in Washington, District of Columbia, and in a room of said hotel, and hurriedly, and in contemplation of a conference between representatives of the United States Bureau of Internal Revenue and some of the persons present at the time the said memorandum was written, which conference had been arranged to be held in Washington, D. C., on said 25th day of May, 1928, at a time within a few minutes after the time at which the writing of said memorandum was started; and said memorandum was not intended to be and was not a complete contract or settlement of the agreement referred to in paragraph 10 hereinabove, nor a statement in writing of all of the terms of the

said oral agreement, but was intended to be and was merely a memorandum or noting down of the principal points of said oral agreement, and identified by the signatures appearing thereon.

"In the said memorandum the reference to 'tax settlement now pending' is to the contemplated settlement of tax liability of said F. J. Lewis and W. H. Lewis and plaintiff upon the appeals and petitions of said F. J. Lewis and W. H. Lewis and plaintiff theretofore filed and docketed with the Board of Tax Appeals; and the reference to 'taxes assessed' is to the deficiency assessments to be established in such settlement, if made; and the reference to 'the Lewises' is to defendant, F. J. Lewis, acting for himself and, also in the interests of defendant, W. H. Lewis; and the reference to 'the Company' is to plaintiff; and the reference to 'dividend' is to the check transactions, in total amount of, to-wit: $1,579,100.91 in the years 1912 to 1929 hereinabove referred to; and the reference to 'case going before the Board of Tax Appeals' is to hearing and trial before the said Board upon the appeals and petitions of said F. J. Lewis and W. H. Lewis and plaintiff theretofore filed and docketed with said Board. A short time after the said memorandum was so written and identified, the attorneys then acting for defendant, F. J. Lewis, and for plaintiff corporation, attended the said conference with representatives of the United States Bureau of Internal Revenue, and, without the holding of a hearing before the Board of Tax Appeals upon the said petitions and deficiency assessments and the controversies connected therewith, the liability of said F. J. Lewis and W. H. Lewis and of the plaintiff for United States income taxes, and excess profits taxes for the calendar years 1917 to 1923 both inclusive was settled and determined by agreement and upon stipulations entered into between the said representatives of the Commissioner and Bureau of Internal Revenue, and the said F. J. Lewis

and W. H. Lewis and plaintiff on the terms hereinafter stated.''

The amended declaration asserted that pursuant to the settlement and agreement and under stipulations between the taxpayers and the government, additional taxes were separately assessed against F. J. Lewis and W. H. Lewis and plaintiff; that plaintiff made payment of additional taxes of $460,934.28 and $73,075.99 interest thereon, making total payments of $534,010.27, which payments were completed on or about February 23, 1929; that F. J. Lewis and W. H. Lewis made payment of additional taxes assessed against them in the sum of $147,519.75, and plaintiff prayed for judgment against defendant in a sum sufficient to reimburse it for the amount it paid out pursuant to the arrangement, with interest thereon from the time of completion of the payments.

Count two of the amended declaration pleaded the common counts. The third count was disposed of when a demurrer was sustained. The court overruled a demurrer to the first count of the declaration. Defendant filed a plea of the general issue and special pleas. Among the special pleas was one that the cause of action, if any, set up in the amended declaration, was barred by the five years' statute of limitations. Plaintiff demurred to the plea of the statute of limitations and the demurrer was sustained. Plaintiff also filed a replication. The trial was not commenced until May 9, 1938. At the close of plaintiff's proofs, the court sustained a motion of defendant to direct a verdict, and judgment was entered against plaintiff, to reverse which this appeal is prosecuted. Plaintiff also filed a written motion for a new trial, and set out among other points that the court erred in declining to admit proper evidence.

The rule is that in considering a motion by defendant to instruct the jury to find for the defendant at the close of plaintiff's case, it is the duty of the court to

consider as true the evidence in its aspect most favorable to the plaintiff, together with all reasonable inferences arising therefrom. The evidence is not weighed, and only that which is favorable to plaintiff is considered. The question as to the exclusion of the evidence was properly presented to the trial court by plaintiff's motion for a new trial. The evidence so excluded, if held to be competent, may now be considered together with the evidence which was admitted. Having the above rules in mind, we shall discuss the evidence in order to determine whether the trial court was right in deciding as a matter of law, that plaintiff had not made a case.

Plaintiff corporation was chartered by the State of Illinois in 1908 under the name of F. J. Lewis Manufacturing Company. On December 29, 1928, the name was changed to International Combustion Tar & Chemical Corporation. On December 31, 1932, the name was changed to Reilly Tar & Chemical Corporation, and in May, 1933, the name was again changed to the Reilly Corporation. It is the same corporation under all of the names. Defendant, F. J. Lewis, was president until 1918 or 1920, at which time he became chairman of the board of directors. His brother, W. H. Lewis, then became president. Defendant owned from 80 to 85 per cent of the stock and his brother owned the balance. In the summer of 1927, defendant and his brother entered into a contract with the International Combustion Engineering Corporation of New York City for the sale of all of their stock to that corporation. All of the capital stock of the F. J. Lewis Manufacturing Company was sold to the Engineering Corporation for the purchase price of $11,000,000 plus. In July, 1927, before the sale of the stock was completed, assets of the Lewis Company in the amount of $1,818,791.25 were delivered by that company to defendant by resolutions adopted by the board of directors of the company. The resolution recited that

the transfer of assets was "for the purpose of providing a fund out of which to pay a part of additional tax claims made by the Commissioner of Internal Revenue for the years 1917, 1918, 1919 and 1920 and in which to set apart Capital Assets theretofore rejected by the Commissioner of Internal Revenue as a part of the Invested Capital of F. J. Lewis Mfg. Co. and by him declared to constitute distributions made by F. J. Lewis Mfg. Co. and taxed to recipient stockholders for tax year 1921 and prior thereto." The stock was actually transferred in September, 1927. However, defendant continued as chairman of the board of directors until some time in 1929, and his brother continued as president until the same time. G. G. Guthrie Hunter was vice-president and comptroller of the International Combustion Engineering Corporation, which from now on, we will call the Engineering Corporation. G. Learned was president of the Engineering Corporation. The office of the Engineering Corporation was in New York City, and the office of the F. J. Lewis Manufacturing Company was at 2500 South Damen ave., in Chicago, and continued at that address until it moved to New York on or about January 1, 1929. At the time the Engineering Corporation purchased the stock and for three or four years prior thereto, there was pending and undisposed of a claim by the bureau of internal revenue against the F. J. Lewis Manufacturing Company for deficiency taxes for the years 1913 to 1921, inclusive, and 1923, in the amount of $511,340, and there was also pending a claim by the bureau against F. J. Lewis covering the same years in question for deficiency taxes in the amount of $348,799 and against W. H. Lewis in the amount of $5,448. The claims had been resisted by the respective taxpayers and had been pending before the board of tax appeals for some years prior to the purchase of the stock by the Engineering Corporation. The claims of the government for deficiency taxes were based upon check transactions between the F. J. Lewis Manufacturing Company and

F. J. Lewis and W. H. Lewis. During the years in question, checks totaling $1,579,100.91 had been drawn out of one of the bank accounts of the manufacturing company, payable to F. J. Lewis or W. H. Lewis, and by them deposited in another bank account of the manufacturing company, known as the "Moline Account." The funds in the Moline Account were used principally for the purchase of tank cars and securities. For 1913 and later years the company filed returns for income taxes and excess profits taxes and the individuals filed their returns for such taxes. In March, 1925, the government made a deficiency assessment of income taxes and excess profits taxes against the three taxpayers. In 1926 and 1927 additional claims and assessments and notices were given to the three taxpayers. The amounts of the additional or deficiency assessments so made, were as follows:

Against F. J. Lewis Manufacturing Co.,
taxes on income during the years 1917 to
1921 ...............................$511,340.00
Against F. J. Lewis, taxes on income during
the years 1913 to 1920.................. 219,019.00
together with penalties in amount of.... 129,780.00
Against W. H. Lewis, taxes on income during the years 1919 and 1920, in the amount
of .................................. 5,448.00

The penalties assessed against defendant were for failure to report and make returns of the income claimed against him. The principal claims of the government were that the checks in the amount of $1,579,100.91 were dividend payments made by the corporation to the Lewis brothers and should be taxed to them as individuals and as income by them received. They had not reported these "Moline Account" check transactions as dividends or income received by them. Under an amendment to the income tax law which went into effect in 1917, a corporation in reporting its income for taxation was authorized to deduct each year from the total amount of income a percentage of its

invested capital. The government claimed that the company in drawing the checks, reduced the invested capital each of the years of 1917 and 1920. As the checks were made, entries had been made on the books of the company which indicated a reduction of invested capital and later on entries had been made on the books of the company purporting to restore the invested capital of the company. No declaration of a dividend by the corporation was made during the years in question. The contention of the bureau was that the checks, having been drawn originally from the company and made payable to the individuals, although redeposited in the company's bank account, constituted income on the part of F. J. Lewis and W. H. Lewis and as such was taxable income. Following that line of reasoning, the bureau also claimed that the invested capital of the company had been decreased by the amount of the checks so drawn, even though the amount represented by the checks was as a matter of fact, returned to the company in the form of investments. It automatically followed that if the invested capital had been reduced during that period of years, the exemption from income tax that the company would be entitled to would be decreased. Andrew J. Ryan of Ryan, Condon and Livingston, attorneys of Chicago, and William Lux, an attorney of Chicago, acted as attorneys for the taxpayers in filing petitions before the board of tax appeals. Defendant was informed by the attorneys of the proceedings and was consulted constantly by them. The petitions on appeal filed by the company and the Lewis brothers denied that the Moline check transactions were dividends in fact, and asserted that the amounts of such check payments had remained a part of the assets of the corporation at all times, or had been restored to the invested capital thereof soon after the respective check payments.

On January 9, 1928, a power of attorney was executed by the corporation granting authority to W. S. Orr of New York City and Andrew J. Ryan and Wil-

liam Lux, acting either jointly or severally, to appear before the treasury department and to represent the company in the income tax matters then pending, with full authority to do anything in the premises that the company could do if personally present, and with full power to make any compromise, adjustment or settlement of said tax matters. Defendant knew of this power of attorney. Mr. Orr was a member of the law firm of White and Case in New York and had been specializing in income tax cases. He made an investigation of the controversies between the company and the government pending before the board of tax appeals. On February 23 and 24, 1928, a conference was held at the office of Mr. Orr in New York, attended by F. J. Lewis, Andrew J. Ryan, William Lux, Mr. Orr and G. G. Guthrie Hunter. Mr. Hunter was then vice-president of the Engineering Corporation that had purchased the stock, and an officer of the Lewis Manufacturing Company. In the conference Ryan and Lux represented defendant. Plaintiff introduced evidence that Mr. Orr represented the F. J. Lewis Manufacturing Company. Defendant, on the other hand, maintains that Orr represented the Engineering Corporation. In the conference Orr told defendant that the points involved in the tax appeals were rather intricate tax problems, that there might be some conflict of interest between F. J. Lewis and the Manufacturing Company as to procedure, and expressed the view that the three cases should be combined in some way. Mr. Orr stated to defendant that the corporation had two positions which might be taken in the cases: First, that the money had never been distributed to the Lewises as a dividend, and, Secondly, that if it had been distributed as a dividend, the Lewises had immediately returned it to the company. This, he stated, was because the money had never actually been used by the Lewises and because the company had never actually declared any dividends and because the company had reversed its charge against surplus and credited back

to surplus the amount of the payments that went into the Moline account. He told defendant that he believed the company had a very strong case and could defeat the government in its contentions on the $1,579,000 of distribution, and thereby the company's taxes would be materially reduced, if not entirely wiped out. Mr. Orr told defendant that the amounts of tax liability asserted by the government against him aggregated $345,000, including the fraud penalties, together with the taxes on the distribution to him in 1927 (which he, Orr, felt confident would be assessed) computed at $360,000, making a total of $705,000. He told defendant the company's maximum liability was $545,000. He quoted defendant as saying the $705,000 liability was too great by at least $96,000. Mr. Orr suggested the possibility that the government would tax the $1,818,000 transfer of assets of the company to defendant in 1927 (as a part of the Engineering Corporation deal) as a dividend in 1927 at the rate of 20 per cent, and that if the Moline check transactions were held not to be dividends, that result would follow; also if the view were taken that the early check withdrawals, even if held to be dividends, had been placed back in the company assets. The next day the parties met again at the office of Mr. Orr. The latter told defendant that the company should argue that the dividends were not paid, and if paid, were returned immediately to the company, thus forming greater invested capital and less taxes, and that to take that position on behalf of the company would be in conflict with the position he, Orr, would have to take representing defendant. Orr stated that in defendant's own case he should take the position that the dividends were paid out in the early years, reducing the invested capital of the company (which would increase the company's taxes) because the tax rate in the early years was much less, and that the money was loaned back to the company and not given to the company as invested capital, so that the distribution made in 1927 would not be a tax-

able distribution. Mr. Orr told defendant that the two positions were definitely in conflict and that it would be impossible for him to act for both the company and the Lewis brothers individually, because the interests were opposed, that it would be difficult to have one side argue that the dividends were paid and the other side argue that they were not paid, and he expressed the opinion that the proper thing to do was to get together and combine forces against the government and take the position which would result in the lowest tax. He suggested that in pooling the interests, the reductions secured should apply to F. J. Lewis and W. H. Lewis in the ratio of seven to five for the company's benefit, that is, five-twelfths of any reduction to apply to reduce the liability of the company. Mr. Lewis objected, stating the $700,000 was too much of an apportionment against him. Orr told defendant that he would not continue in the case until the parties got together and handled the matter in common, but if the interests were combined, with an arrangement whereby the tax would be paid by the two parties, then it would not make any difference whether the tax was assessed against the company on the one side or against the Lewises on the other side, because that would be a pooling arrangement; that the equitable way to handle the matter was for the parties to pool their interests against the government and try to get the taxes of both settled by an economical amount, regardless of whether the amount was assessed against the Lewises or the company, and that "we should agree as to how the amount of the double tax liability should be borne as between the Lewises and the Lewis Manufacturing Company." Orr testified that Lewis said he would think it over and that he or Mr. Hunter would let him (Orr) know the following day. Mr. Orr also told defendant that there should be some arrangement with regard to fees paid in the case and the division thereof. The following day, February 25, 1928, Orr met with Hunter, Lux and Ryan. Orr testified that

Hunter told him that he had a talk with defendant and that defendant and Hunter had agreed ''that everything was arranged for us to go ahead except how we are going to divide our fees.'' The parties present then proceeded to discuss the form in which they would prepare a brief to be submitted on behalf of the Lewises individually and the company. Orr made suggestions as to the form of the brief. Ryan stated he thought the procedure outlined by Orr was in accordance with his (Ryan's) ideas, and asked Orr to prepare the brief. Accordingly, a statement in writing in the nature of a memorandum and brief and a proposal of settlement, was prepared by Orr and signed by him and Ryan. The brief, dated March 1, 1928, was submitted and signed by White & Case and Ryan, Condon & Livingston, attorneys for the company and the Lewises. Walter S. Orr and Andrew J. Ryan are designated as ''Of counsel.'' The brief was offered in evidence by plaintiff as Exhibit 11. The court admitted the portion of it which ''contains the signatures of the parties concerning whom we have been talking, it being understood that the purpose of the offer is to indicate that these counsel did join in the preparation of this document which has been called a brief, but which is, as a matter of fact, in the parlance of our procedure at least, a memorandum or proposal.'' This brief or proposal of settlement was filed with the bureau of internal revenue at Washington on March 4, 1928. It contains much that has been recited and was filed on behalf of the three taxpayers whose appeals were pending under six docket numbers. The brief also recited that the reason for the check transactions was that the company was in serious competition ''with large and powerful interests and that such interests, it was believed, had access to the accounts of the Company obtained through one of the Company's employees, and believing that the Company was in a weakened cash position such competitors attempted to take advantage of this situation by attempting to purchase tar prod-

ucts and other assets at amounts which they would not have attempted to purchase if they had thought that the Company was in a position to pay cash for such property. In this business F. J. Lewis states that ability to pay cash for raw materials was an important element in determining the purchase price thereof. If, therefore, the competitors of the Company believed that it was unable to make a cash payment for a large quantity of raw material they would bid a lower price for such raw material than they would have bid had they believed that the Company would be in a position to make a cash payment for such material. In order, therefore, that the Company would always have a liquid amount available for making immediate purchases the 'Moline Account' was regarded as a secret cash reserve unknown to any of the employees of the Company and unknown to them for the specific reason that F. J. Lewis believed his competitors had access to the Company's figures.'' The brief further called attention to the fact that the 1927 item is new matter injected into this case; that ''payment in 1927 constitutes a dividend in 1927 for the reason that for the first time the Lewises actually received assets of the Company after proper corporate action. The resolution is an unusual one, but a study of the situation at the time this resolution was passed will give the reason for its peculiarity. The purchasers of the Company did not want to pay more than a certain amount for the stock of the Company. They had available only a specific sum of money and the Lewis Company's assets indicated a value greater than that sum. It was, therefore, suggested that the stockholders take out of the Company approximately $1,800,000, thus reducing the purchase price of the stock by that amount.

''In considering this situation, however, the Lewises pointed out to the purchasers that the Government had taken the position that certain assets in the hands of the Company ($1,579,100.91), and which the Company had asserted belonged to it, were in fact the property

of the Lewises. If the Government's position were correct it would be unnecessary to declare a dividend as the Company would owe that amount to the Lewises. On the other hand if the Company's position were correct, and the Company naturally believed such to be the fact, then this $1,579,100.91 would have to be paid out. In this situation it was difficult to know what to do, because if the Company had paid out $1,579,100.91 in past years and was then about to distribute an additional $1,579,100.91, this would deplete the net worth more than the desired amount in connection with the purchase. Faced with this situation, the resolution and agreement were drawn up. It is submitted that the import of this resolution and agreement is briefly this: If it is ultimately determined that no dividend was paid by the Company from the years 1912 to 1921, then, to the extent of $1,579,100.91, this payment shall constitute a dividend. On the other hand if it is ultimately determined that there was a dividend in the years 1912 to 1921, then this payment, to the extent of $1,579,100.91 shall not be a dividend.'' The brief continues as follows:

"In order to close out all questions regarding the company's affairs which are now before the Board of Tax Appeals, and to close out all questions of dividends and penalties which are now before the Board of Tax Appeals in the personal cases, and also the question of dividends in the year 1927, it is proposed that a determination be reached as follows: (1) The invested capital of the F. J. Lewis Mfg. Co. be increased by the amount of alleged dividends paid in each of the years to 1921 aggregating $1,579,100.91. In all other respects the determination of the deficiency letters will be acquiesced in. (2) The additional taxes to the Lewises for the years prior to 1927 on account of dividends and penalties be removed. (3) The Lewises pay a tax in the year 1927 of at least 20% on $1,579,-100.91. As far as the Lewises are concerned this is

in addition to all other taxes which may properly be due for any of the years under consideration. The results of such a determination are believed to be more advantageous to the Government than the results should the case be litigated to its conclusion. At the same time the Company is particularly anxious to close out its tax liabilities as it is seriously in need of the $250,000 in dispute for its business purposes. The counsel for both the Company and the Lewises are, of course, not unmindful of the fact that in any litigation they may not get as much as they believe they will and this, of course, is also a reason for suggesting the proposed determination. Finally it should be pointed out that by such a settlement the Company is giving up any claim it may have with respect to wash sales, depreciation and other minor items which it has already disputed, which involve a tax of approximately $110,000. It is also giving up any questions which it may have with respect to the statute of limitations and the sending of two deficiency letters; the second being almost $75,000 larger than the first. It is also giving up the very important point that even though the checks may be dividends, nevertheless so far as the Company is concerned they might constitute paid-in surplus. This point has not been discussed in this memorandum but it is a real point. The Lewises on the other hand are paying a tax in 1927 of $316,000 against a total tax and penalty if dividends in the earlier years of approximately $250,000. They are also giving up whatever rights they may have with respect to the statute of limitations, assuming that the fraud charges are removed. It is firmly believed that such a determination will give the Government that to which it is entitled, will save expense in litigation for the Government and the taxpayers, and will permit the Company to carry out some of its business projects by being able to use $250,000, which must now be reserved until this case is settled.

"Counsel for the Company and the Lewises wish to point out that it is their desire to withhold none of the facts from the Government in an effort to reach a fair determination in these cases. By the same token, it believes that the Government will frankly state its position in this matter." A copy of the resolution adopted by the Company in 1927 and heretofore quoted, was attached to the brief as Exhibit A. On March 30, 1928, Andrew J. Ryan wrote Mr. Orr as follows:

"I am enclosing herewith a letter to you from Mr. William Lux, together with the detailed statements attached thereto. Mr. Lux has been working on this matter continuously for the past three days and in the light of the conversation which you had with him over the telephone and also myself yesterday, it was necessary for him to make very substantial revisions and go into the matter more thoroughly than we had anticipated was necessary.

"There is one thing that you may start out on as a settled fact: that there are no inadmissibles involved in the reduction of the invested capital of $1,579,100.91.

"A very interesting situation presents itself in connection with the Lewises' return. I do not pretend to analyze the statements as prepared by Mr. Lux. In addition to being a lawyer, he is also an expert accountant and I have no doubt that the figures which he submits to you are the correct ones. The interesting feature that I call your attention to is the fact that by eliminating the dividends and penalties from the account of F. J. Lewis, the Government will owe Lewis money. Therefore, I can see very little use, if any, of attempting to present this side of the matter to the conferees. It seems to me that all that can be said to them on behalf of the Lewises is that if the Government will restore invested capital to the corporation, the corporation will pay whatever the tax may be and the Lewises will pay 20% on $1,579,100.91 declared as a dividend in the year 1927 amounting to $315,820.18.

"On the other hand, this is what is in my mind as an alternative proposition to a settlement of all the matters:

"The total tax and penalties for both the company and the Lewises is $851,911.57.

"If we lost the dividends but won the penalties the amount to be paid by both the company and the Lewises is $714,826.87.

"If we lost the dividends but won the penalties and won the wash sales and pioneer realty, the total amount to be paid by the company and the Lewises would be $651,781.00.

"We have made the proposition that the company will pay $261,000 and the Lewises $315,820.18, making a total of $576,820.18. Therefore, the difference between what we offered to pay and what the Government would receive in the event that we lost the dividends but won the penalties, wash sales and pioneer realty is $74,960.82. I believe it would be well to make the proposition to the Government that the Company pay $345,960.82 and the Lewises pay $315,820.18. My reason for that is this: We have an excellent chance of winning the penalties and also the wash sales and pioneer realty. As a matter of fact, on the wash sales, when Mr. Lux argued this matter in Washington a few months ago covering the years 1919 and 1920 of F. J. Lewis, Mr. Iden practically conceded to Mr. Lux the wash sales. Therefore, Lewis has a splendid chance of reducing the taxes and penalties so assessed against him for years prior to 1927 to the extent of $200,130.57. Notwithstanding that he has this possibility, he is still willing to pay 20% on the dividend declared in 1927 in order to settle and compromise this matter. I am not unaware of the fact that the question of a second dividend in 1927 may be presented against Mr. Lewis but I am perfectly willing that Mr. Lewis take his chances on this matter. Therefore, in view of the fact that Mr. Lewis is practically giving up $200,000 which he has a

very good opportunity to win, the company should add the additional $74,960.82 to the amount that we have previously stated it was willing to pay. If we proceed upon this plan, then all that we have to argue before the conferees is that if they will eliminate the penalties and the wash sales and pioneer realty, the company and the Lewises will pay the balance of the tax and wipe out everything else.

"My recollection now is that at the time the International purchased from the Lewises, it received $151,000 on account of taxes and entered into an agreement with the Lewises to pay, if necessary, an additional $394,000 making a total of $595,000. If under the plan suggested in this letter the Company pays only $345,000, it will save $200,000. In other words, the company will make a saving equal to the amount that Lewis is willing to give up in order to effect this adjustment.

"I wish you would give the matter consideration and let me know your reaction.

"I am writing this just before the close of the air mail as I hope to get this off to you in time for you to receive it Saturday morning." On April 13, 1928, Orr wrote to the general counsel of the bureau of internal revenue at Washington. The letter discusses the tax appeals and states, "The individuals will pay under the proposed adjustment taxes of $315,820.18 against the total aggregate now asserted of $340,571.43." The court refused to admit this letter in evidence. On May 16, 1928, a conference was arranged to be held on May 25, 1928, at Washington, D. C., to be attended by Orr and the representatives of the government. As a prelude to that conference, F. J. Lewis, Ryan and Lux met Orr and Hunter at the Washington Hotel on the morning of May 25, 1928. The meeting was in Orr's room in the hotel. Orr testified that in the bedroom he stated that "we ought to make up our minds at that time as to how much we were willing to pay in the aggregate, that is, between the company and the Lewises, to settle this

case." He said he thought they ought to pay not more than $630,000 for the taxes against the company and the Lewises. He quoted Lewis as saying to him that he was willing to agree that the aggregate tax against the company and the Lewises would be as high as $630,000. Orr stated to Lewis that he, Orr, understood there was an agreement made with Lewis and Hunter, representing the Lewis Company, that Lewis individually and his brother were willing to pay one-half of whatever taxes may be asserted in the settlement of the cases, and that the Lewis Company would pay the other half. Witness Orr quoted defendant as saying that that was his understanding of the agreement between him and the Lewis Company. Orr then suggested that they ought to have some kind of a writing on that and very quickly, in the last five minutes before the hearing he, Orr, drafted a paper on the stationery of the Washington Hotel, which he said to Lewis represented his (Orr's) understanding of the agreement that Lewis and the company, through Hunter, had reached. Orr testified that Lewis read the paper over and said it was his understanding of the agreement which had been reached, and then the defendant signed it. The paper drafted by Orr has heretofore been set out in an excerpt quoted from the amended declaration. The memorandum was also signed by "G. G. Guthrie Hunter, Vice President of the International Combustion Corporation." Orr then told the parties that they were expecting to meet the representatives of the government in an effort to reach a settlement of the case, if a settlement were possible, and for that reason he wanted to know how much he was authorized, in dollars, in reaching a settlement, before he went over there, and that that was the main purpose of meeting together at that time. Orr told defendant that he did not know exactly how the settlement was going to be worked out by the government, that it might be worked out one way, which might indicate a large tax against

the company, or in another way indicating a large tax against the Lewises, and that he wanted to have an understanding that no matter which way the tax fell "we had an arrangement to divide the tax 50-50." He testified that at the conference it was said that the maximum amount to be paid by the company or by the Lewises was $630,000, plus interest and plus penalties, and on a 50-50 basis that would mean $315,000 each. He quoted defendant Lewis as saying to him, "I don't mind paying this tax, but I want it distinctly understood that in any settlement you make, the fraud penalties must be removed." Orr stated that he told defendant that they would not settle the cases without also settling defendant's liability, if any, for the distribution made in 1927, and that if they did not reach a settlement the company would not give up any claims it had or right to claim that the dividend had never been paid. At the time of the meeting in the hotel, Mr. Hunter was an officer of the F. J. Lewis Manufacturing Company and he was vice-president of the Engineering Corporation. Immediately after the memorandum was written, Orr, Ryan and Lux left the Washington Hotel bedroom and attended a conference in the treasury building with representatives of the United States Bureau of Internal Revenue. Mr. Orr was asked what was said and done at the conference. On objection, the court refused to permit him to answer. On July 31, 1928, written stipulations were signed by the attorneys acting for the three taxpayers, under which orders were entered establishing the taxes on the deficiency assessments. The taxes established against the Lewis Manufacturing Company were $460,934.28, with interest of $73,075.99, making a total of $534,010.27. The taxes assessed against defendant were $156,277.90, less a credit for overpayment in 1917 of $13,411.02, or $142,-866.88. The taxes assessed against W. H. Lewis were $4,652.87. In the settlement it was arranged that no penalties be assessed against F. J. Lewis or W. H.

Lewis, and that the government would not tax F. J. Lewis or W. H. Lewis on the sum of $1,579,100.91 for the tax year of 1927 in connection with the transfer of assets of plaintiff corporation to F. J. Lewis. In the settlement the company surrendered its claims that its invested capital had not been reduced by the claimed dividend transactions. The settlement was made without the case going before the board of tax appeals for a hearing on the merits. Plaintiff argues that in the settlement and in signing the stipulations on behalf of F. J. Lewis Manufacturing Company, Orr acted under the power of attorney given to him by the company and on reliance of the offers and proposals made in the conference at the hotel.

On June 20, 1928, prior to the filing of the stipulations with the board of tax appeals, Mr. Ryan wrote a letter to the general counsel of the bureau of internal revenue at Washington, D. C., stating that on that date he had delivered to a Mr. Iden of that department a waiver of settlement on the express agreement that the distribution to the extent of $1,579,100.91 made to the taxpayer by F. J. Lewis Manufacturing Company in the year 1927, shall be nontaxable. The letter recites that it is being written so that there will be no misunderstanding in the matter as the taxpayer is making settlement upon the express understanding that the distribution taxed in the years prior to 1921 shall not be retaxed in the year 1927. On June 22, 1928, Orr forwarded waivers to the commissioner of internal revenue at Washington, and expressed an understanding similar to the understanding expressed by Ryan in his letter of June 20, 1928. On July 17, 1928, the acting commissioner of the bureau of internal revenue addressed a letter to Mr. Orr, acknowledging the "consents" and confirming the understanding that if the cases are settled on the basis of the stipulations, the sum of $1,579,100.91 claimed by the Lewis brothers as distribution from the F. J. Lewis Manufacturing Com-

pany in the years 1913 to 1920, shall not again be included in the income of the said individuals for the year 1927. The court refused to admit into evidence the letters dated June 20, June 22, and July 17, 1928. Plaintiff also offered a copy of the individual income tax of F. J. Lewis for the year 1927, which the court also declined to admit. The income tax return for 1927 alludes to the arrangement regarding the $1,579,100.91, and that it will not be taxed for 1927, and that it is a part of the $1,818,791.25, the assets set apart from the company before the sale of stock to the Engineering Corporation. Plaintiff also presented the deposition of William R. Boynton, taken at New Jersey on April 28, 1928. Witness identified plaintiff's Exhibit 28 as a journal entry prepared under his direction as supervisor of bookkeeping of plaintiff, for entry into the records of plaintiff and on instructions of Mr. Hunter, an officer of plaintiff. The court refused to admit the exhibit, or a number of questions asked regarding it. Plaintiff urges that the exhibit was an original entry in the books of account of plaintiff corporation against defendant and constituted a charge in the amount of $211,247.44, representing the difference between the amount paid by Lewis and one-half of the total taxes assessed against the Lewis Manufacturing Company, F. J. Lewis and W. H. Lewis in the settlement of tax appeals with the government. Plaintiff made payment of the additional taxes and interest in the amount of $534,010.87 in six instalments, the last one dated February 23, 1929. F. J. Lewis made payment of the additional taxes assessed against him in the amount of $182,000.

Defendant who was called to the stand under the provisions of section 60 of the Civil Practice Act (sec. 184, ch. 110, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 104.060]), testified that he was present at the conferences in Mr. Orr's office on February 23 and 24, 1928. He stated that "there never was a question whether I

would be taxed upon the $1,818,000.00 I received in 1927, until he brought it up about the possible double taxation.'' Mr. Lewis further testified that he did not know who Orr represented, that he knew Orr had a power of attorney from the F. J. Lewis Manufacturing Company and that the power of attorney had not been revoked. He stated that on February 25th he told Hunter that the proposition of bunching the tax bills of the corporation and the individuals would not be satisfactory, stating that ''we would not permit it''; that in the conference in New York, Mr. Lewis stated that he and his brother would pay only the amount of the tax allocated against them individually. Mr. Lewis testified that the power of attorney was given Orr for the sole purpose of allowing him to study over the papers. Mr. Lewis' version of the conference at the Washington Hotel on May 25, 1928, is that Mr. Hunter told the conferees that he had called defendant on the long distance telephone a few days prior thereto and had told defendant that ''things were in a hell of a mess in Washington,'' and had suggested that a meeting be arranged between Ryan, Lux, Orr and Hunter in Washington; that Orr had been in Washington a few days previous thereto and had had a meeting with the conferees and had made an engagement to meet the conferees at 10 o'clock that morning; that Hunter stated that Orr had reported to him (Hunter) that by reason of the great hostility that existed against Ryan, Lux, Lewis and the F. J. Lewis Manufacturing Company that he (Hunter) wanted to make some kind of an agreement whereby Orr could go before the conferees as a representative of the new owners of the stock of the F. J. Lewis Manufacturing Company and thereby overcome some of what he stated was ''this great hostility''; that Orr had advised Hunter that the conferees were going to settle the tax matters of the Lewis Manufacturing Company, F. J. Lewis and W. H. Lewis for one amount, to wit: $630,000; that the same statements

were repeated by Orr; that Orr stated that the government was not interested in who paid the $630,000; that they were going to render a bill for that amount and that they did not know against which parties, W. H. Lewis, F. J. Lewis or the F. J. Lewis Manufacturing Company; that the government was not interested in that, and that the chips might fall one way or the other. Mr. Lewis further testified that he got his hat and walked into the vestibule; that Hunter jumped up and put his hand on his shoulder and said, "Wait a minute, F. J., we are down here to get a settlement of the tax matters and I don't want you to leave. We are all here for that purpose and I would like to do something toward getting a settlement made." Witness testified that he replied to Hunter, stating, "I was going out in the hall to think by myself." He quoted Hunter as saying, "I want to make a proposition to you. You heard what Orr said, the Government is going to assess you, your brother or the company. That would be pretty tough on you if they assessed it against you, and tough on the company. Either one or the other will be let out without paying any taxes. I want to make a suggestion to you that we split the $630,000.00. I, as vice president and comptroller of the International Combustion Engineering Corporation, have the authority to make this proposal and we will stand half of it if you will stand the other half." Witness continued that he replied to Mr. Lewis as follows: "You are forgetting we have a contract in regard to the taxes. The contract covers the matter of how the taxes are to be paid. I am not going to do anything that will make any major change and I think that is what you are suggesting," and quoted Hunter as saying, "There won't be any major change"; that he said to Hunter, "Do you remember I left $150,000 with the International Combustion at the time that we sold our stock, to cover part of the taxes. You remember the International Combustion Engineering Corporation agreed to pay up to $540,000 of which my brother and myself left $151,-

000 in the hands of your company. Now I am not going to do anything that will change that provision''; that Hunter said, ''F. J., all the different things in connection with the sale of your stock has been agreed to. Everything has gone along nicely and I certainly am not going to make any change in that. I couldn't even if I wanted to.'' Lewis testified that he then said, ''Well, with that understanding that there will be no change, I think it will be safe to go along on the suggestion that you make, keeping in mind we are going to get credit for the $151,000 we left in your hands''; that Hunter replied, ''All right,'' and Mr. Orr said, ''All right, we will draw up some kind of a memorandum.'' It was then witness said the memorandum was written.

The amended declaration averred an oral agreement between the parties and that a written memorandum of the agreement was made and signed by the defendant and Hunter, and further avers that the memorandum was not intended to be and was not a complete contract or statement of the terms of the agreement, but was intended to be and merely was a memorandum of the principal points of the oral agreement. Plaintiff argues that the proof supports the allegations of the amended declaration upon two theories: one, the offer and acceptance by act theory, and two, the adoption and ratification theory. Plaintiff also insists that the court erred in declining to admit certain proffered testimony and exhibits in the evidence. Defendant repels the contention of plaintiff by denying that he entered into any oral agreement with plaintiff, and that the evidence establishes that if there was any contract at all, such contract was made with the International Combustion Engineering Corporation, which had purchased the stock of the F. J. Lewis Manufacturing Company from F. J. Lewis and W. H. Lewis. Defendant maintains that there was no privity of contract shown between plaintiff and defendant. Defendant urges that the court was correct in its ruling on the admissibility of proffered exhibits and testimony, and

that the action of the court in directing a verdict against the plaintiff was proper. Defendant concludes by insisting that the cause of action set out in the amended declaration is barred by the statute of limitations, and that the trial court erred in sustaining plaintiff's special demurrer to his plea of the statute of limitations. In the statement of the case, as presented to the trial court, we have pointed out that defendant, who testified under section 60 of the Civil Practice Act (sec. 184, ch. 110, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 104.060]), gave an account of the conferences in the offices of White and Case in New York City in February, 1928, and at the Washington Hotel in May of the same year, that is very much at variance with the testimony on which plaintiff relies. While defendant was called as a witness by plaintiff, nevertheless, he was called under the provision of section 60 of the Civil Practice Act, which provides that upon the trial of any case any party thereto may be examined as if under cross-examination at the instance of the adverse party and for that purpose may be compelled, in the same manner and subject to the same rules for examination as any other witness, to testify, but the party calling for such examination shall not be concluded thereby but may rebut the testimony thus given by counter testimony.

In deciding the proposition as to whether the court was correct in directing a verdict, we are required to view the testimony in its aspect most favorable to the plaintiff. The testimony of Mr. Lewis which tends to defeat plaintiff's cause, would be material if we were considering the proposition as to whether the verdict was contrary to the weight of the evidence. The memorandum reduced to writing in the Washington Hotel on May 25, 1928, was signed by the defendant and by G. G. Guthrie Hunter, vice-president, International Combustion Engineering Corporation. Defendant infers that if there was a contract, the memorandum constituted the contract, and that the court acted properly in

not permitting testimony explanatory of the memorandum. Defendant also argues from the fact that Hunter wrote after his name, "Vice President, International Combustion Engineering Corp.," that he (Hunter) was acting for the Engineering Corporation. The well-established law is that when a contract is reduced to writing, it is conclusively presumed that the written instrument expresses the entire contract between the parties and that all prior and contemporaneous negotiations in respect to the subject matter of the contract are excluded. However, the rule is frequently relaxed and parol evidence is admissible when necessary to an understanding of the meaning of a document. Extrinsic evidence is also competent to identify the parties to the contract. Parol evidence is admissible to show the situation of the parties and the circumstances under which an instrument was executed, for the purpose of ascertaining the intentions of the parties. Turning to the memorandum of May 25, 1928, it becomes obvious that without the aid of extrinsic evidence, that memorandum is not understandable. The memorandum alludes to a "tax settlement" then pending and to "taxes assessed" against either the "Lewises or the Company"; to an understanding that "the dividend if taxable in prior years is not taxable in 1927, and vice versa." Without explanatory testimony, the meaning of the document is not clear. Defendant maintains that because Hunter wrote "Vice President, International Combustion Engineering Corp.," after his name, the memorandum constituted, if anything, evidence of a contract with that corporation. It is clear from the memorandum that the defendant intended to set out evidence of a contract with someone. It cannot be contended that Lewis intended to enter into a contract, either oral or written, with Mr. Hunter individually. Hence, the evident intent of the memorandum was to reduce to writing the essential terms of the agreement between Lewis and plaintiff, or between Lewis and the International Combustion Engineering Corporation.

Plaintiff argues that in view of the fact that the memorandum mentions a tax statement pending against the company, that when it states that the amount of any taxes assessed shall be paid 50 per cent by the Lewis brothers and 50 per cent by the company, the evident intent of the parties was that the use of the word "company" meant the F. J. Lewis Manufacturing Company. Plaintiff points out that the "company" that had the tax claims pending was the plaintiff and not the International Combustion Engineering Corporation. We agree with the contention of plaintiff that it had the right to introduce testimony and exhibits for the purpose of enlightening the court and the jury as to the meaning of the memorandum.

Viewing the case from the offer and acceptance theory advanced by plaintiff, there is evidence that in the conferences in New York, on the advice of Mr. Orr, defendant consented to the proposition that the three tax cases be presented to the government officers with the view to having the cases settled or otherwise disposed of without a conflict of interest. From plaintiff's viewpoint of the evidence (which at this time we are required to accept), it had a good defense against the effort of the government to collect deficiency assessments. Mr. Orr pointed out the conflict of interest between plaintiff and defendant and his brother, and threatened to withdraw from the case unless some arrangement was made. Defendant acceded to the suggestion of Orr and the latter accordingly prepared a brief which was signed by the attorneys for the three taxpayers. Orr negotiated with the internal revenue bureau and arranged an appointment with government agents at Washington on the morning of May 25, 1928. As heretofore recited, the parties met Orr in his hotel room, and it was at that time that the memorandum was drafted and signed. Immediately thereafter, Orr, Ryan and Lux, the attorneys representing the taxpayers, attended a conference with representatives of the

bureau of internal revenue. The court declined to permit Mr. Orr, a witness for plaintiff, to testify concerning what was said and done at the conference. Thereafter, the settlement was made with the government and the taxes were paid. Plaintiff contends that the settlement was made in accordance with the oral agreement upon which it relies. Defendant urges that there is no evidence to establish the contract or the acceptance of the contract by plaintiff. In repelling that contention, plaintiff points out that Orr had a power of attorney from it (plaintiff), which constituted ample authority for him to act for plaintiff in accepting the contract and in negotiating with the government officers. We are satisfied that there is evidence to sustain plaintiff's position in that respect. We consider the power of attorney as being broad enough to authorize Orr to act for the plaintiff in making the oral agreement. There is also testimony that Hunter was an officer of plaintiff corporation. The law is that knowledge of an agent while acting within the scope of his authority and in reference to a matter over which his authority extends, is knowledge of the principal. There is evidence that Orr was acting as attorney for the company in the tax matter and that Hunter was a director of the plaintiff. Hence, it is presumed that the knowledge derived by Hunter and Orr was communicated to plaintiff. Plaintiff points out by way of argument that it stipulated not to press its defense against the government claim, and that the logical reason why it relinquished that defense without a hearing was that it was relying upon the agreement. We are of the opinion that there was competent evidence which tended to support the ''offer and acceptance by act'' theory of plaintiff.

As an alternative, plaintiff advanced the theory that there was an adoption and ratification of the acts and agreements done and made on its behalf by Orr and Hunter. Ratification is defined as the express or im-

plied adoption and confirmation by one person of an act or contract performed or entered into in his behalf by another, who at the time assumed to act as his agent in doing the act or making the contract without authority to do so. When we view the admitted evidence that is favorable to plaintiff's theory and also the proffered testimony and exhibits which were excluded, we arrive at the conclusion that plaintiff also made out a prima facie case under the adoption and ratification theory.

Plaintiff asks us to decide as to the correctness of the trial court's ruling that certain proffered testimony and exhibits were not admissible. Among these is Exhibit 11, which was the brief, dated March 1, 1928, prepared by Orr and signed by the attorneys for the three taxpayers. Attached to it as an exhibit was the resolution adopted by the plaintiff corporation, wherein the sum of $1,818,791.25 was set apart from current assets of plaintiff and turned over to defendant to be held by him in escrow. Proffered Exhibit 13 was the letter dated April 13, 1928, from Orr to the general counsel of the bureau of internal revenue. Proffered Exhibit 16 was the letter dated June 22, 1928, from White and Case to the commissioner of internal revenue. Proffered Exhibit 17 was the letter dated June 20, 1928, from Ryan to the general counsel to the bureau of internal revenue. Exhibit 18 was the letter dated June 17, 1928, from H. F. Mires, acting commissioner of the bureau of internal revenue, addressed to Mr. Orr. Proffered Exhibit 19 is a copy of the individual tax return of defendant for 1927. The taxpayer swore to the truth of the return before a notary public on March 15, 1928. Proffered Exhibit 28 consisted of a "journal entry" entered in the records and accounts of plaintiff. As heretofore mentioned, the court declined to allow Orr to testify what was said and done at the conference with the representatives of the government, attended by Orr, Ryan and Lux, immediately after the Washington Hotel conference. We are of the opinion that the

court was in error in refusing to admit the exhibits and proffered testimony. They tended to show that plaintiff and defendant, following the February conferences, worked together in attempting to make a settlement of the tax controversies pending on appeal; that it was understood between them that they would endeavor to secure a joint settlement, with an arrangement for a division of total taxes, and that the settlement was made in accordance with the hotel conference offer. Testimony of Orr as to what was said and done at the conference with the representatives of the government, was clearly competent, and was closely connected with the transaction at the hotel, and was a step in carrying out the agreement which plaintiff maintains was entered into. Plaintiff also had a right to examine Mr. Orr for the purpose of having him deny, if he could, various statements made by defendant when called as a witness under section 60 of the Civil Practice Act. In passing on the respective contentions, we have considered the proffered testimony and exhibits that were improperly excluded as well as the testimony and exhibits that were admitted. From a careful consideration of the record, we are convinced that plaintiff made out a prima facie case, and that the court was in error in deciding as a matter of law that the evidence did not present any issue of fact for the jury to pass on.

Defendant, in arguing his cross error, asserts that the amended declaration stated a new cause of action, and that the suit is regarded as having been commenced as to such cause of action at the time of the filing of the amended declaration, which was more than five years after the said action was alleged to have accrued, and is barred by the statute of limitations. He calls our attention to the fact that the original declaration was filed on April 24, 1933, and that the amended declaration was filed on June 25, 1936. It is a fact that the amended declaration was filed more

than five years after the cause of action accrued. Plaintiff states that the substitution of one cause of action for another cause of action is not the character of amendments permitted or contemplated by section 39 of the Practice Act of 1907 [Cahill's St. 1931, ch. 110, ¶ 39]. That act provides that if "it shall appear from the original and amended pleading that the cause of action asserted or the defense interposed in the amended pleading grew out of the same transaction or occurrence and is substantially the same as set up in the original pleading, even though the original pleading was defective in that it failed to allege the performance of some act or the existence of some fact or some other matter or matters which are necessary conditions precedent to the right of recovery or defense asserted," the amendment shall be held to relate back to the date of filing the original pleading so amended, and the cause of action set up in the amended pleading shall not be barred by any statute limiting the time within which the action may be brought. We have examined the original and amended declarations, and are of the opinion that the amended declaration states a cause of action which grew out of the same transaction or occurrence, and is substantially the same as is set up in the original declaration, and that the amended declaration did not state a new cause of action. The trial court was right in sustaining the demurrer to defendant's plea of the statute of limitations.

Defendant filed an additional record which consists of copies of depositions which were not offered in evidence in the trial court. We presume that the purpose of bringing up this additional record was to show that plaintiff had available certain witnesses whom he did not call. Since we must view the evidence in its aspect most favorable to plaintiff, the additional record was unnecessary. Therefore, the motion to strike the additional record is allowed.

For the reasons stated, the judgment of the circuit court of Cook county is reversed and the cause remanded.

*Reversed and remanded.*

Denis E. Sullivan, P. J., and Hebel, J., concur.