## In re Liquidation of Inter-State Inter-Insurance and Inter-State Exchange.

*March 8—April 11, 1933.*

*Harry V. Meissner* of Milwaukee, for the appellants.

For the respondent Insurance Commissioner there was a brief by *Frank T. Boesel* and *C. F. Rouiller,* both of Milwaukee, and oral argument by *Mr. Boesel.*

FAIRCHILD, J.   There can be no question but that a corporation, organized as was the Inter-State Exchange, may borrow money and incur liabilities necessary to enable it to carry on its business.   The association known as the Inter-State Inter-Insurance was not incorporated.   It was a voluntary association of individuals, partnerships, and corporations, who proposed to and did exchange inter-insurance contracts.   The statute in such case made and provided required the policyholders in such an exchange to designate an attorney to act for them.   Before permitted to do business the "Association" must submit proof of applications for at least one hundred separate risks to become concurrently effective, and also proof that a minimum of $50,000 is on hand in cash, or securities authorized by law for the investment of funds of insurance companies.   From an operating viewpoint it was practically impossible to secure sufficient concurrent applications to accomplish the deposit of premiums amounting to $50,000 in advance of the issuance of a license to do business, and the situation was met by the corporation, as distinguished from the "Association," at the first meeting of the stockholders of the corporation October 5, 1920, as appears from its minutes, in the following manner:

"It is further agreed in order to comply with section 1915*m* (now 201.39) of the Wisconsin Statutes, that for the remaining fifty shares which are not subscribed for the subscriber for each share shall agree to pay $100

therefor as called in and shall further agree to deposit $1,000 in securities which are acceptable under section 1903 of the Statutes, which said securities may be exchanged from time to time by the subscribers; and it is further agreed that all dividends and interest on said securities shall belong to the respective subscribers."

This minute and the stock subscription set out in the statement of facts show what may be styled a borrowing by the corporation of the securities and the existence of an agreement between the corporation and its stockholders with relation thereto. The securities under this agreement were placed in the keeping of the corporation to enable it to operate a business in which it was engaged for profit for the advantage of its stockholders although other purposes may have been incidental thereto.

The facts in the case are undisputed. The securities agreed to be deposited by the terms of the stock subscription were called in at the first meeting of the board of directors of the Inter-State Exchange, and there was filed with the insurance commissioner proof thereof, and the Inter-State Exchange for its own purposes exercised control over these securities. Among the securities were those for which appellants have made claim. The Inter-State Exchange was acting as attorney in fact for the Inter-State Inter-Insurance. We must bear in mind there are two distinct concerns here involved, one a corporation with usual powers, the other a voluntary association with limited powers, with no power to borrow money, sec. 201.39 (6), working together for the accomplishment of a common object, but at the same time each having an interest of its own, peculiar to itself, which it was serving. The "Association" and the corporation were both interested in the administration of reciprocal or inter-insurance as provided by statute and discussed in 1 Joyce, Insurance (2d ed.) pp. 28 and 803; 1 Cooley, Briefs on Insurance

(2d ed.) p. 70.   But the corporation, while of service to and making possible the working of the "Association," was also to be a source of profit to its stockholders.   Provision was made by the corporation for an earning out of the premiums received from policyholders, as follows: thirty per cent. of the premiums were to go to the corporation, twenty per cent. to agency fund, an estimate in accordance with the average experience required approximately thirty-two per cent. for the payment of claims, leaving eighteen per cent. to be returned to the policyholders, unless the claims and losses exceeded thirty-two per cent., or unless it was decided to increase the allowance for agency fund.

It appears that the corporation was organized and designed to earn profits for its stockholders as well as to serve members of the "Association."   If the owners of the securities are limited in their claim for a return of their securities to the corporation, then their claim was properly disallowed.   In the course of the business of the corporation during the years it was active, the distinction between it and the "Association" was emphasized and relied on by the corporation itself.   This is particularly so in a difference which arose between it and the insurance department in the year 1922.   In this circumstance the fact also appears that the title to the securities deposited with the corporation by the stockholders was in the corporation subject to redemption when the proper reserve had been established. The insurer was the "Association," but in the adjustment of the differences which then existed between the corporation and the insurance department and for the purpose of keeping the "Association" solvent, it was definitely arranged that the guaranty fund, that is these securities, were not a liability of the "Association."   At this time objections had been raised by the corporation to the insurance department of the state treating this guaranty fund as a liability of the

"Association," and it was then asserted by the corporation that the securities amounting to the sum of $50,000 and constituting the guaranty fund was not a liability of the members of the "Association."

The inter-insurance provided for by this scheme was carried on from March 1, 1922, until the spring of 1930, when financial difficulties overwhelmed the combination and judgments entered against policyholders remained unpaid. Then the securities deposited with the corporation as a guaranty fund were disposed of and the money raised upon their sale was used in paying pressing claims. During the month of February, 1930, the insurance commissioner took control of the affairs of the "Association." The existing policies were underwritten by independent insurance companies and there was a sale of the "Exchange" with the approval of the insurance commissioner. A petition was filed beginning this action for the liquidation of this "Association" and the levying of an assessment against the policyholders to pay losses. The appellants filed their claims demanding the return of the cash proceeds received on the sale of securities deposited by them and appropriated for the payment of judgments. The opposition to the allowance of these claims is based on the proposition that the loaning of the securities to the corporation did not create any liability against the "Association" or the policyholders.

Can the loss to appellants through the sale of the securities under the existing conditions be held to be a loss which the "Association" should assume and pay by making assessments on the policyholders? The corporation failed to arrange for a reserve that would permit the release of the securities. The guaranty fund throughout its existence was considered to be the property of the corporation. The method devised for providing the fund, the manner of handling it, and the specific arrangement made at the time the solvency of the "Association" was questioned by the

insurance department, all negative the idea of any liability for this fund resting upon the "Association" or the policy-holders. There appears in the arrangement expectation that the corporation would earn profits and that the guaranty fund was an essential in its plan. The stock subscriptions are strong and supporting evidence of that. That there was reason for the organizers of this enterprise to expect profits to arise from the business is evidenced by the fact that in 1929 the gross premiums were upwards of $525,000, of which thirty per cent., or about $157,500, legally belonged to the corporation.

The evidence does not disclose that the policyholders who were members of the "Association" were ever advised that this $50,000 guaranty fund was a part of their liability. No mention of it appears in the application for a policy or in the policy itself, and the course of conduct of the directors and officers of the corporation are consistent only with the idea that the obligation rests upon the corporation to refund to the contributors the securities so deposited or the proceeds thereof.

The facts and circumstances thus briefly reviewed furnish sufficient evidence to sustain the ruling of the trial court that no assessment can legally be made against the policy-holders or the "Association" for these claims of the stock-holders of the corporation arising out of the agreement by which it secured their stock. *Dewey v. Davis,* 82 Wis. 500, 52 N. W. 774; 19 L. R. A. n. s. 639.

*By the Court.*—Orders affirmed.