862

Thompson, Knight, Harris, Wright & Weisberg and William H. Neary, all of Dallas, for appellant.

White, Taylor & Chandler, of Austin (Ike D. White and Grady Chandler, both of Austin), for appellees.

BAUGH, Justice.

Lawyers Lloyds of Texas brought this suit for itself and for the benefit of Underwriters at Lloyds, London, against H. A. and Jess D. Carter to recover $12,500 paid out by appellant under an indemnity bond executed by Insurance Managers, Inc., on behalf of the subscribers to the Texas Fire & Casualty Underwriters of Dallas, Texas, on which appellant was surety. Trial was to the court without a jury, and judgment rendered that plaintiff take nothing; hence this appeal.

The Texas Fire & Casualty Underwriters, hereafter referred to as the Underwriters, was a reciprocal insurance exchange organized and operated under the provisions of Art. 5024, R.C.S. It operated through Insurance Managers, Inc., hereafter referred to as the corporation, authorized by Art. 5025, R.C.S., Vernon's Ann.Civ.St. art. 5025, as its attorney in fact, and could transact its business in no other way. Pursuant to the provisions of Art. 5025, R.C.S. as amended, said corporation in December, 1939, executed an indemnity bond in the sum of $50,000, payable to the Board of Insurance Commissioners of Texas, for the use and benefit of the subscribers of the Underwriters, indemnifying them against any pecuniary losses sustained by the Underwriters as the result of any act of fraud, dishonesty, forgery, theft, embezzlement, wrongful abstraction or wilful misapplication caused or committed by the attorney in fact corporation. At the time of the execution of said indemnity bond in December, 1939, H. A. and Jess D. Carter were president and vice-president, respectively, of the corporation, directors thereof, and owners of more than 90% of the stock.

The Underwriters continued to do business by and through said attorney in fact corporation until October, 1941, when it was placed in the hands of a receiver by the Board of Insurance Commissioners and thereafter suit was instituted by said receiver, through the Attorney General, on said bond for the sum of $24,325. That suit was settled by the appellant which paid to said receiver $12,500, and the suit was dismissed. This suit seeks to recover from H. A. and Jess D. Carter the $12,500 so paid on the ground that as officers and directors of the attorney in fact corporation, in complete control not only of the corporation but of the Underwriters, they had wilfully misapplied the funds and accounts receivable of the Underwriters, such conduct by them causing the losses

suffered by the Underwriters which appellant was compelled to pay under said bond; and that they are therefore personally liable.

The asserted misapplication of the assets of the Underwriters by the appellees is predicated upon the assignment by the Underwriters to the attorney in fact corporation, at its instance, in December, 1939, of premium accounts receivable and notes aggregating $76,689.42, some of which, the exact amount not being shown, were then more than 90 days past due and had, under the rules of the Board of Insurance Commissioners, become nonadmissible assets of the Underwriters in calculating its reserve as against its liabilities. The corporation thereupon borrowed from a Dallas bank the sum of $75,000 evidenced by its note for that sum, with which it purchased for the Underwriters $75,000 in bonds which became assets of the Underwriters. The accounts receivable and the bonds were pledged as collateral to secure the $75,000 note, but the bonds were never delivered to the bank. Both the bonds and the accounts receivable in fact remained in possession of the Underwriters which continued to collect them.

During the early part of 1940, all of said bonds were sold or paid off, the funds received therefrom applied on the corporation's note to the bank, and all of the unpaid accounts receivable which had been pledged as security on the note turned back to the corporation and by it to the Underwriters, thus placing it in substantially the same status which existed prior to the inception of these transactions. This same method of procedure was repeated several times by the attorney in fact corporation between June 30, 1940, and January 27, 1941, and in October, 1941, the Board of Insurance Commissioners determined that the Underwriters was insolvent and it was placed in the hands of a receiver. It was then found that many of the accounts receivable of the Underwriters were long past due and uncollectible causing the insolvency. It is the contention of appellant that an actual continuous condition of insolvency of the Underwriters existed from and after December, 1939; that the methods resorted to by the attorney in fact corporation were but a subterfuge to show solvency which in fact did not exist; that through such transactions the Underwriters was enabled to continue doing business, incurring new liabilities while its accounts receivable depreciated in value, thus increasing the ultimate loss suffered by the Underwriters, which appellant had to pay; and that same was due to the mismanagement and misconduct of appellees who controlled the corporation. It is further contended that when the Underwriters assigned its accounts receivable to the attorney in fact corporation at face value, such assignment was a complete transaction vesting full ownership thereof in the corporation; that the Underwriters became the absolute owner of the funds deposited with it with which the bonds were bought; and that if the accounts receivable so assigned were then, or thereafter became, uncollectible or depreciated in value prior to their reassignment to the Underwriters, the corporation and not the Underwriters must sustain such loss, under the rule laid down particularly in Trade Mutual Liability Ins. Co. v. Peters, 291 Mass. 79, 195 N.E. 900, and in Re Liquidation of Interstate Exchange et al., 211 Wis. 258, 247 N.W. 839.

If the attorney in fact corporation, through such transactions, were attempting to protect itself or to profit by such transactions, or if the Underwriters were insolvent at the time of such transactions and suffered a loss thereby, the rule announced in the above cited cases might apply. But there was no proof that this was true.

The proof showed that in February, 1940, H. A. Carter, then president of the attorney in fact corporation, reciting that he then owned all of the stock of the corporation, sold such stock to F. M. Moulton and E. F. Dardnne for $25,000, $2,500 then paid in cash, and the remainder to be paid in monthly installments, all maturing prior to May, 1941, and retained a lien on the stock to secure the purchase price. The contract of sale provided that he should remain president of the corporation until the stock was paid out, but gave to the new purchasers power to vote all of said stock, and the control and management of said corporation through officers other than the Carters, subject only to H. A. Carter's lien on the stock. Thereafter the new stock owners took over and exercised the control, management and operation of said attorney in fact corporation. On May 1, 1941, Moulton and Dardnne sold said stock to D. W. Bartlett, Sam Darden, and E. D. Burleson, who in turn sold it shortly prior to the receivership to one Brickman. H. A. Carter testified that after his sale of such stock on February

13, 1940, he had nothing to do with the management of said corporation. Consequently his personal liability for the misconduct, if any, of the attorney in fact corporation should be limited to the time during which he had control thereof and for which he was responsible. The only transactions during that period of time, on which the Carters could be held liable, were the assignment of the accounts receivable in December, 1939, the bank loan to the corporation of $75,000, the purchase of bonds in that amount, the subsequent sale thereof, and the reassignment of the funds received from such sale and of the pledged accounts receivable back to the Underwriters.

While the evidence showed that an appreciable portion of the accounts receivable so transferred in December, 1939, were more than 90 days past due at the time and could not therefore be considered by the Board of Insurance Commissioners as admissible assets of Underwriters, and probably that some of them were even then uncollectible, there was no competent proof and no finding by the insurance examiner that the Underwriters was insolvent at any time during the period involved in those transactions. On the contrary, H. A. Carter testified, which testimony was not contradicted, that if all the 90-day overdue accounts receivable had been excluded, Underwriters still would have possessed assets in excess of its liabilities. He also testified without contradiction that the only transactions (those between December, 1939, and May, 1940) in which he participated profited the attorney in fact corporation not a cent, did not occasion any loss whatever to the Underwriters but resulted in a profit to it instead, in that it saved the Underwriters gross premium taxes to the State of Texas in the sum of $1,792.99. It was agreed that if the bond purchase transaction had not occurred the Underwriters would have been required to pay a gross premium tax of 3.25% on $83,542.54 for the year 1939. That as a result of the exchange of securities wherein the bonds were purchased and carried as assets of the Underwriters as of December 31, 1939, the tax was computed at the rate of ⅝ of 1% on the bonds, which resulted in a net saving to the subscribers of the Underwriters of the $1,792.99. Carter further testified, without contradiction, that this saving to the Underwriters was the sole and only purpose of the exchange of such securities; that it was the usual and customary practice of such reciprocal companies; that it had been followed for a number of years by the Underwriters with the knowledge and acquiescence, if not with the approval, of the examiners of the Board of Insurance Commissioners; and that such examiners knew of the particular transactions here involved. Further, that such procedure did not jeopardize the accounts receivable nor the solvency of the Underwriters, but that the Underwriters continued to collect such accounts receivable as though they had never been assigned or pledged; and in addition to the tax saving affected, the Underwriters also received the benefit of the interest accruing on the bonds purchased between the date of the purchase and the dates same were paid off or sold.

Whatever misconduct, if any, of the corporation as such which occurred after the Carters had disposed of their stock and the corporation's control and management had passed into other hands, obviously could not be attributed to them, nor could they be held personally liable for resulting losses to the Underwriters, if such losses were sustained.

Under such facts and circumstances, the trial court was clearly authorized to find that the Carters were not guilty of any acts of fraud against, or misapplication of the funds of, the Underwriters within the terms of the indemnity bond and to deny appellant any recovery.

Finding no error, the judgment of the trial court is affirmed.

Affirmed.