## CONRAD v. OLDS.

[No. 16,692. Filed November 14, 1941. Rehearing denied December 23, 1941. Transfer denied January 17, 1942.]

*Earl B. Barnes* and *Charles M. Wells,* both of Indianapolis, and *Oscar L. Williams,* of Shelbyville, for appellant.

*Fae W. Patrick* and *Thomas E. Garvin,* both of Indianapolis, and *Wilbur F. Pell* and *Wilbur F. Pell, Jr.,* both of Shelbyville, for appellee.

BEDWELL, J.—The appellant filed an intervening petition in the receivership represented by the appellee, by which she sought to force the appellee to return to her certain corporate stock of the Continental Steel Corporation and to account for dividends thereon. There was a trial by the court and a finding for the appellee.

Appellant is relying solely upon the overruling of her motion for a new trial and upon the ground thereof that specified that the decision of the trial court was not sustained by sufficient evidence.

The following facts are shown by the record: On December 29, 1926, appellant's decedent, Albert A. Charles, was the owner of 210 shares of the common stock of Kokomo Steel and Wire Company and he then entered into a written agreement with the Federal Underwriters, Inc., an Indiana corporation, by which he agreed to trade such stock for $21,000 worth of the common stock of the Federal Underwriters, Inc., at $10 per share, or for 2,100 shares. This agreement contained a clause giving Charles the right to reacquire

the 210 shares of stock of the Kokomo Steel and Wire Company upon sixty days written notice and a return of the 2,100 shares of stock of the Federal Underwriters, Inc. The certificates were exchanged between Charles and the Federal Underwriters, Inc., between December 29th and December 31st, in the year 1926; but the Federal Underwriters, Inc., did not cause the title to the 210 shares of stock of Kokomo Steel and Wire Company to be transferred on the books of the corporation.

During the period between December 31, 1926, and July 27, 1927, the Kokomo Steel and Wire Company merged with certain other corporations and the resulting corporation was known as the Continental Steel Corporation. On July 27, 1927, appellant's decedent was the record holder of 166 shares of the preferred stock and 1,105 shares of the common stock of the Continental Steel Corporation, which stock, prior to such merger, had been represented by the 210 shares of common stock of the Kokomo Steel and Wire Company that had been transferred as heretofore set forth. On such date appellant's decedent and the Federal Underwriters, Inc., entered into the following written agreement:

"AGREEMENT

July 27, 1927

"It is understood and agreed that in consideration of Mr. A. A. Charles endorsing to the Federal Underwriters, Fifty-five Thousand, Two Hundred and Thirty Dollars ($55,230.00) of the Continental Steel Corporation stock, made up of One Hundred and Sixty-six (166) shares of preferred and Eleven Hundred and Five (1,105) shares of common stock, that Fifty-five Thousand, Two Hundred and Thirty Dollars ($55,230.00) of the Federal Underwriters common stock, par value Ten Dollars ($10.00) per share, will be issued to Mr. A. A. Charles.

"It is further understood and agreed that upon Sixty (60) days notice in writing to said effect, the Federal Underwriters will return said stock of the Continental Steel Corporation, in its entirety, upon surrender of said The Federal Underwriters stock, or the payment of Fifty-five Thousand, Two Hundred and Thirty Dollars ($55,230.00) in cash.

"It is further understood and agreed that upon Sixty (60) days notice in writing to said effect, Mr. A. A. Charles will return said stock of the Federal Underwriters, in its entirety, upon said surrender of said Continental Steel Corporation stock, or the payment of Fifty-five Thousand, Two Hundred and Thirty Dollars ($55,230.00) in cash.

"THE FEDERAL UNDERWRITERS,
"By G. E. Harsh,
President.
"Accepted:
"A. A. Charles."

In connection with such agreement, a certificate for 3,423 shares of the capital stock of the Federal Underwriters, Inc., was issued to appellant's decedent and he, or his executrix, has continued to hold such certificate and the prior certificate for 2,100 shares since such time.

Following the making of such agreement and the delivery of the stock certificates, the Federal Underwriters, Inc., placed the stock certificate for the stock of the Continental Steel Corporation in the reserve funds of the subscribers at the Federal Automobile Insurance Association, a place where reciprocal insurance contracts were exchanged in accordance with the reciprocal insurance laws of the State of Indiana (§ 39-2801 to § 39-2815, Burns' 1940 Replacement, both inclusive). These reserves are required by the insurance law of the State of Indiana which requires, "there shall be maintained, in the case of automobile insurance, in cash or such securities, assets suffi-

cient to discharge all liabilities on all outstanding losses arising under policies issued, same to be calculated on the basis of net premiums or deposits, as in this section defined, and in accordance with the laws of the state relating to similar reserves for companies insuring similar risks." § 39-2806, Burns' 1940 Replacement. The words "such securities" refer to securities of the kind designated by the laws of Indiana for the investment of funds of insurance companies doing the same kind of business as the subscribers at Federal Automobile Insurance Association, which was the insuring of automobiles. Such stock certificate had been indorsed in blank by Charles and delivered to the Federal Underwriters, Inc., with knowledge that it would place the same in the funds of the subscribers at the Federal Automobile Insurance Association. The stock was not transferred on the books of the Continental Steel Corporation until after the appointment of appellee as receiver. A receiver was appointed for the Federal Underwriters, Inc., because of its insolvency on March 2, 1928, and on the same day appellee was appointed receiver for the funds and assets of the subscribers at Federal Automobile Insurance Association. These funds and assets were at that time and ever since have been insolvent and insufficient to discharge the liabilities. The receivership of Federal Underwriters, Inc., has been closed in the Marion Superior Court, which had jurisdiction of both receiverships; but prior to the closing thereof there was a determination that as between the two receiverships, the appellee receivership owned the stock of the Continental Steel Corporation by virtue of the aforesaid transfer to said funds.

From February 9, 1920, to the date of the appointment of such receivers, the Federal Underwriters, Inc., was the attorney in fact for each subscriber at the

Federal Automobile Insurance Association; and at the time that the stock of appellant's decedent was deposited in the reserve funds of such subscribers, he was a stockholder of Federal Underwriters, Inc., and a regularly elected, qualified and acting member of the advisory committee of the subscribers at Federal Automobile Insurance Association. After appellee was appointed receiver, appellant's decedent made a written demand upon him for the return of the Continental Steel Corporation stock and tendered the stock of the Federal Underwriters, Inc., obtained therefor. Prior to the appointment of the receivers heretofore mentioned, the insurance department of the State of Indiana, and the insurance departments of certain other states, had questioned the solvency of the reserve fund of the subscribers; and on November 9, 1927, the advisory committee of the subscribers held a meeting at which appellant's decedent was present and a letter was prepared, delivered to and accepted by him, which was as follows:

"Indianapolis, Indiana,
November 9, 1927.

"Mr. A. A. Charles,
  Kokomo, Indiana.

"Dear Mr. Charles:

"Referring to the conversation held in the office of T. S. McMurray, Jr., Inc., during the meeting of the Advisory Committee of Federal Automobile Insurance Association November 9, 1927, it is our understanding that the one hundred and sixty-six (166) shares of preferred and the eleven hundred and five (1,105) shares of the common stock of the Continental Steel Corporation that you have furnished to be used as reserves, we are retaining the stock until the surplus and reserves of the Federal Automobile Insurance Association reach an amount that will make its use for that purpose unnecessary. You are to have the privilege at any time of substituting any other approved securities; and it is specifically understood that this stock is not to be

sold or liquidated in any manner and any advance in value of this stock shall revert to you.

"FEDERAL AUTOMOBILE INSURANCE ASSOCIATION
The Federal Underwriters
Attorney-in-Fact
"By Joseph O. Hilger"

Thereafter, and on November 17, 1927, a written contract was entered into between the Federal Underwriters, Inc., as party of the first part, and certain individuals, including appellant's decedent, as party of the second part, by which the members of the party of the second part agreed to furnish to Federal Underwriters, Inc., the sum of $57,300 to be advanced by it to the funds of the subscribers at Federal Automobile Insurance Association.

There is but little, if any, dispute in the evidence, but the trial court was justified in inferring therefrom that the reserve funds of the subscribers at the Federal Automobile Insurance Association were in a precarious condition during the years 1926, and 1927, and for sometime prior thereto; that such condition had resulted because their attorney in fact, Federal Underwriters, Inc., had not properly managed the business; and that there was danger that the subscribers would be barred from continuing in business in the State of Indiana and in certain other states; that this condition was known to the officers of Federal Underwriters, Inc., and to appellant's decedent, and they realized that if the subscribers at Federal Automobile Insurance Association were barred from continuing in business that the investments of the stockholders of the Federal Underwriters, Inc., in its stock, would probably be lost. There is no evidence that any of the policyholders, or any of the creditors of Federal Automobile Insurance Associa-

tion had any actual knowledge of the reserved rights of appellant's decedent to require a return of Continental Steel Corporation stock as is evidenced by the written agreement heretofore set forth.

The legal contentions of appellant, that are the basis of her claim of error, may be summarized as follows:

(a) That the reservations by A. A. Charles of his right to reacquire the stock indorsed in blank by him and delivered to the Federal Underwriters, Inc., under the agreements of December 29, 1926, and July 27, 1927, were valid and enforceable.

(b) That the rule prohibiting an exercise of a reserved right to rescind, if corporate creditors would be harmed by the exercise thereof, has no application to the situation here existing.

(c) That the Federal Automobile Insurance Association was not an entity of any sort and that it took the stock of the Continental Steel Corporation subject to the rights and defenses existing between Charles and the Federal Underwriters, Inc., at the time of its transfer; that knowledge of the Federal Underwriters, Inc., of the rights of Charles will be imputed to the subscribers who are not bona fide purchasers, and that under the conditions here existing appellant's rights are superior to the rights of policyholders in the reciprocal insurance association.

This court has recognized the validity of an agreement entered into between the stockholders of a corporation and a purchaser of stock by which stockholders agreed to repurchase the stock before a certain date at a specified price, if the purchaser desired to sell. *Culp* v. *Holbrook* (1920), 76 Ind. App. 272, 129 N. E. 278; *Fast* v. *Baker* (1921), 76 Ind. App. 677, 131 N. E. 57.

The majority of the courts, and this court, have sustained the validity of agreements by a corporation, made at the time of the issue or sale of its stock, to repurchase or redeem the stock or to cancel the subscription therefor and refund the consideration paid where no question of the rights of creditors or of other stockholders is involved. *Campbell, Rec.,* v. *Grant Trust & Savings Co.* (1933), 97 Ind. App. 169, 182 N. E. 267; Annotation: 101 A. L. R. 154. But where there are corporate creditors to whom the enforcement of such an agreement would work a prejudice, the courts are agreed that such an agreement will not be enforced. *Campbell, Rec.,* v. *Grant Trust & Savings Co., supra; Hoover Steel Ball Co.* v. *Schaefer Ball Bear. Co.* (1919), 90 N. J. Eq. 164, 106 A. 471; *McIntyre* v. *E. Bement's Sons* (1906), 146 Mich. 74, 109 N. W. 45, 10 Ann. Cas. 143; Fletcher's Cyclopedia Corporations (Perm. Ed. 1931), Vol. 6, 759-762, 775-777; 13 Am. Jur., Corporations, § 252, p. 353.

In the case of *Hoover Steel Ball Co.* v. *Schaefer Ball Bear. Co.* (1919), 90 N. J. Eq. 164, 168, 106 A. 471, 472 the court, in holding that a contract made by a corporation, at the time of a sale of its stock, to repurchase the same at the option of the purchaser thereof, could not be enforced when the corporation was insolvent and the rights of corporate creditors would be injuriously affected thereby, uses the following language:

"The reasoning underlying the determination of the courts is that the capital stock of a corporation constitutes a trust fund for the payment of debts and that creditors are presumed to contract with the corporation upon the faith that its stock, so far as appears by its records, has been paid in, and that those who appear to be stockholders are, in fact, stockholders; this entirely aside from statute. If a purchaser of, or subscriber to, stock may con-

tract with the corporation that it shall repurchase the stock, then every purchaser or subscriber may do likewise, and if these contracts may be enforced against the corporation after insolvency, then not only will creditors be deprived of recourse to the capital stock as a trust fund, but the apparent purchasers and subscribers will be converted into creditors to share with other creditors whatever assets there may be left. Such a situation is, of course, opposed to public policy and cannot be permitted to exist."

In the case of *Sarbach* v. *Fiscal Agency Co.* (1912), 86 Kan. 734, 739, 122 P. 113, 115, where a corporation sold its stock to a purchaser who acknowledged its receipt, and entered into a collateral agreement with him that it would not discount the notes given therefor, but surrender them to him, and any moneys paid thereon, if the purchaser should desire to return the stock, the court said:

"It would seem true, as a matter of principle, that a solvent corporation acting through its officers who are authorized by the stockholders or by its charter might, as between itself and a subscriber, contract to purchase back his stock. But this does not mean that it would do so regardless of the rights of creditors, or that an insolvent corporation, acting through its officers without direction or knowledge of the stockholders, could do so at their expense and over their protest. The reason and justice of the thing as well as the overwhelming weight of authority is that subscribers to the shares of a corporation should stand on an equal footing. Every one knows that subscriptions are often induced by knowledge that other investors have subscribed, and it is the usual and customary thing to make use of this fact to secure investments by others who are solicited. If such subscriber, without the knowledge of the others, enters into a contract with the company by which he is allowed to remain in if the venture is successful, and retire without loss if it proves a failure, the most primary promptings of justice and fair dealing dictate

that he should not claim this advantage against the other shareholders when such claim amounts to his gain as measured by their loss."

When we consider the agreements that were entered into between appellant's decedent and the Federal Underwriters, Inc., on December 29, 1926, and July 27, 1927, we must appreciate the fact that one motive of A. A. Charles, in making such agreement, was to prevent loss if the business of Federal Underwriters, Inc., was not successful and the stock did not become more valuable than the stock of the Continental Steel Corporation. If this were a matter solely between Charles and Federal Underwriters, Inc., of such a nature that no creditors or stockholders of the Federal Underwriters, Inc., or no third persons would be injuriously affected thereby, then, under the decisions of this court, the agreement might be carried out. But when, as here, the rights of others who are not a party to the agreement, but who will be seriously affected thereby, are concerned, a different question is presented for determination.

But appellant contends that the subscribers, as subsequent assignees, took the stock of the Continental Steel Corporation subject to the rights and defenses existing between appellee's decedent and Federal Underwriters, Inc., at the time of the transfer to the latter. When appellant's decedent indorsed, in blank, his stock certificates and delivered them to Federal Underwriters, Inc., the transfers were governed by the provisions of our Uniform Stock Transfer Act (Acts 1923, ch. 24, p. 71, § 25-701 to § 25-723, Burns' 1933, both inclusive). This act gives a character equivalent to that of negotiability to stock certificates, for under the provisions of the act title to the stock certificate and to the shares represented thereby is transfer-

able by delivery of the certificate indorsed in blank, and equities in favor of the owner may be cut off by indorsement of the certificate by the person appearing to be the owner and by its delivery to a bona fide purchaser. Aside from the effect of the Uniform Stock Transfer Act upon the question of the negotiability of a stock certificate and the protection afforded bona fide holders for value, without notice of facts making the transfer wrongful, the holder of a stock certificate, like a holder of any other non-negotiable instrument, may be protected on principles of estoppel where he was led to purchase the paper on the faith of another's promise, conduct or perhaps negligence.

In the case of *Moore* v. *Moore* (1887), 112 Ind. 149, 152, 13 N. E. 673, where the holder of a promissory note was induced by fraud and without consideration to indorse and deliver the same to another, who after maturity indorsed it to an innocent purchaser for value and without notice, the Supreme Court held that the latter took title and that the original holder was estopped as against him to deny the title of the fraudulent indorsee. In the course of the opinion by Judge Mitchell, he says:

> "Whatever right remains in the assignor of an instrument thus assignable, after the holder has transferred it by an unrestricted endorsement, must of necessity be of a purely equitable character. It is not perceived, therefore, why an innocent purchaser, who takes such an instrument by endorsement for value, and without notice of the latent equities of prior endorsers, may not stand upon the rule that where the equities are equal he is in the situation of advantage who holds the legal title. If one of two equally innocent parties must suffer, that one who, by his endorsement of the instrument, has conferred upon another the apparently absolute ownership of the paper must bear the loss.
> . . . .

"We are unable to discover any good reason for a distinction in that regard between chattels and such instruments as may be assigned by endorsement, so as to give the assignee a complete legal title.

"The more modern rule upon the subject under consideration seems to be, that where the owner of things in action, although not technically negotiable, has clothed another, to whom they are delivered in the method common to all mercantile communities, with the usual apparent *indicia* of title, he will be estopped from setting up against a second assignee, to whom the securities have been transferred for value and without notice, that the title of the first assignee was not perfect and absolute. . . ."

The general rule is well settled that a stockholder who intrusts another, for a special purpose only, with his stock certificates indorsed or assigned in blank clothes the party to whom the certificates are intrusted with such indicia of ownership that an unauthorized sale or pledge of the certificates by the latter to an innocent vendee or pledgee for value binds the true owner and prevents him from asserting paramount interest in the shares. 13 Am. Jur., Corporations, § 350, p. 423. But appellant insists that the subscribers were not bona fide purchasers for value; that they gave no consideration for the stock that was transferred to their reserve fund, and that Federal Underwriters, Inc., being their agent, acting under a power of attorney, the knowledge of the attorney in fact will be imputed to them.

It is true that in a technical sense the relationship of principal and agent existed between the subscribers and the corporation which acted as their attorney in fact. In the case of *Wysong* v. *Automobile Underwriters, Inc.* (1933), 204 Ind. 493, 500, 184 N. E. 783, our Supreme Court discusses the relative rights of the

attorney in fact and the subscribers under the statutes of this State governing reciprocal or interinsurance contracts, and says:

> "The liability of any subscriber is determined by the terms of the power of attorney executed by, and the policy issued to, a subscriber. These constitute the contract of each subscriber with all other subscribers. The power of attorney is the controlling factor. The attorney in fact can not go beyond the powers granted in the power of attorney creating his appointment. He can not bind the subscriber beyond the limitations expressed in the power of attorney."

There were no provisions in the power of attorney which authorized Federal Underwriters, Inc., to make any agreements of the nature of the agreements entered into with appellant's decedent on December 29, 1926, and July 27, 1927.

It is a general rule that notice or knowledge to an agent is notice or knowledge to the principal of any matter within the scope of the agent's authority, or more accurately stated, notice to or knowledge of an agent while acting within the scope of his authority and with reference to matters over which his authority extends, is notice to or knowledge of his principal. It is also true that an agent's knowledge will not be imputed to his principal where the agent's interest is adverse to that of his principal or where the agent's conduct is such as to raise a clear presumption that he would not communicate the fact in controversy. *Vincennes Savings & Loan Ass'n.* v. *St. John* (1938), 213 Ind. 171, 12 N. E. (2d) 127; *Andrews* v. *Minter Coal & Coke Co.* (1929), 90 Ind. App. 320, 168 N. E. 869; *Knox-Harrison Bank & Trust Co.* v. *Johnson* (1929), 89 Ind. App. 318, 164 N. E. 298; *Reilly Tar & Chemical Corp.* v. *Lewis* (1939), 301 Ill. App. 459, 23 N. E. (2d)

243; *Jamrog* v. *H. L. Handy Co.* (1933), 284 Mass. 195, 187 N. E. 540.

The Federal Underwriters, Inc., in making the agreements of December 29, 1926, and July 27, 1927, with appellant's decedent, was not acting within the scope of its authority or with reference to any matter over which its authority extended as an agent of the subscribers. It was acting solely in its own interest. If it had desired to furnish to the subscribers or to the insurance department of the State knowledge of the particular agreements affecting its title and ownership of the stock of the Continental Steel Corporation, it could have caused some reference to be made to such instrument in the indorsements made by Charles upon the stock certificates, or could have filed a copy of such instruments with the certificates when they were deposited in the funds of the subscribers. Likewise, Charles, if he desired to give notice to the subscribers and the insurance department of the State of his reserved rights, could have caused some reference to the instrument granting the same to be included in the indorsement of his stock certificates. But Charles and the officers of Federal Underwriters, Inc., evidently knew that the stock of the Continental Steel Corporation would not be an acceptable security if there were any restrictions upon its use to discharge the liabilities of the reserve funds. It is a fair inference from the evidence that it was because of this knowledge the stock certificates were indorsed in blank and deposited in the reserve funds without any indication of the reserved rights of appellant's decedent.

Under the terms of the statute, these securities became an asset to discharge all liabilities on all outstanding losses arising under policies issued. Such

assets were a trust fund for the benefit of policyholders in the event of insolvency. Couch's Cyclopedia of Insurance Law, Vol. 8, § 2043, p. 6692; *State* v. *American Bond. & Cas. Co.* (1928), 206 Iowa 988, 221 N. W. 585; *In re Liquidation of Inter-State Exchange* (1933), 211 Wis. 258, 247 N. W. 839; *People ex rel. Palmer* v. *State Life of Illinois* (1938), 296 Ill. App. 337, 15 N. E. (2d) 985.

Appellant's decedent having transferred his stock certificates for value with a blank indorsement and delivered them to the Federal Underwriters, Inc., with knowledge that they were to become a part of a trust fund for the protection of policyholders, and having acquiesced in such use of such stock certificates for several months after knowledge that they had been deposited in such fund, would, after insolvency of the corporation to which he had transferred such certificates and insolvency of the trust fund in which they had been deposited, be estopped from asserting his reserved right to reacquire the certificates or the corporate stock represented thereby. This determination is not dependent upon whether the subscribers at the Federal Automobile Insurance Association were a legal entity or whether any consideration passed between them and the Federal Underwriters, Inc., at the time that the stock was deposited in their fund. The statute permitted the attorney in fact to make deposits to such fund and the evidence shows that it made deposits to such fund with the understanding that they were not to be considered as a liability of the association, except they were to be repaid as the funds of the association might permit. Evidence further showed that the insurance department of this State, and other states, for sometime, had been questioning the solvency of this reserve

fund. Appellant's decedent cooperated with the attorney in fact to produce an apparent condition of solvency so that the association could continue in business and additional liabilities to policyholders accrue. It would violate all principles of justice and fair dealing for appellant, under the conditions shown by the evidence in this cause, to be permitted to withdraw from the appellee receivership these securities which are necessary for the payment of losses arising under policies issued.

The evidence is sufficient to sustain the decision of the trial court, and the judgment is affirmed.

NOTE.—Reported in 37 N. E. (2d) 297.