92 So.2d 829 (1957)
Mary Hall NICCOLLS, Appellant,
v.
W.W. JENNINGS, Betty J. Jennings, Albert Stover, Esther K. Stover, Stanley C. Shaver, Sr., and Stanley C. Shaver, Jr., Individually and as Shaver & Company, L. Scott Paddock, Estate of Mabel Reid, Julia Ensenberger, Floyd N. Shaver, George Pearson, Betty Pearson, Algot J. Lindstrom, First National Bank in St. Petersburg, as Trustee, and Florence N. Bowman, Appellees.
Supreme Court of Florida, Special Division A.
January 30, 1957.
Rehearing Denied March 13, 1957.
Mann, Harrison, Stone, Roney & Mann, Baya M. Harrison, Jr., and Sam H. Mann, Jr., St. Petersburg, for appellant.
Edmund T. Shubrick, and Thomas V. Kiernan, St. Petersburg, for W.W. Jennings and Betty J. Jennings.
*830 Ed W. Harris and Al W. Johannes, St. Petersburg, for Albert Stover and Esther K. Stover.
THORNAL, Justice.
Appellant Niccolls, who was a defendant and cross-defendant in two cases consolidated for trial below, seeks reversal of a final decree adjudicating her interests in certain corporate stock.
The determining point of the appeal is the applicability of several sections of Chapter 614, Florida Statutes, F.S.A., which is the Florida version of the Uniform Stock Transfer Act.
One Stanley C. Shaver, Sr., a St. Petersburg stock broker, was the trusted friend and confidant of appellant Mary Hall Niccolls. On January 16, 1953, Mrs. Niccolls loaned to Shaver 1,000 shares of common stock of Florida Telephone Corporation. The stock at the time had a stated value of $11,000. Simultaneously with the delivery of the stock Mrs. Niccolls and Shaver executed a written agreement which recited that the loan of the securities was for the use of Shaver in his business as broker in order to "insure his compliance with the Securities Exchange Act of 1934". The agreement further provided that the funds could be used by Shaver as if they were capital invested in his brokerage business by Shaver himself. The agreement also contained the following significant provision:
"3. That this agreement is irrevocable and is binding upon the heirs, assigns, administrators and executors of the parties hereto; provided, however, that this agreement may be terminated at any time by either party upon giving of thirty days' written notice in advance of such termination to the other party and to the Atlanta Regional Office of the Securities and Exchange Commission, Room 350, Peachtree-Seventh Building, Atlanta 5, Georgia, and if, but only if, at the date of such termination the ratio of the indebtedness to the net capital of Shaver as a broker and dealer in securities is within the then permissible limits of the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder."
On February 28, 1953, Stanley C. Shaver, Sr., formed a partnership with his son Stanley C. Shaver, Jr., under the name of Shaver & Company. On March 20, 1953, Mrs. Niccolls executed another agreement in which she recited the formation of the partnership and stated that the loan above described "shall be considered a loan by me to Stanley C. Shaver personally for the purpose of investing said funds as part of his capital in your [Shaver & Company] business". Sometime in December, 1953, Mrs. Niccolls apparently became concerned about the safety of her investment and began pressuring Shaver for the return of her stock. Her demands continued through the early part of 1954. Obviously, from this record Shaver was not in a position to return either the stock or the value thereof. Apparently in order to avoid immediate collapse, he set upon a scheme which ultimately resulted in this law suit.
It will be recalled that he borrowed 1,000 shares of Florida Telephone Corporation stock from Mrs. Niccolls said to be worth $11,000. He had to repay it. Not having the stock himself, he had to devise some plan to obtain 1,000 shares of the same stock. Early in June, 1954, Shaver represented to W.W. Jennings that Florida Telephone Corporation contemplated a merger with Peninsular Telephone Corporation and that if Jennings would deliver his Florida Telephone stock to him (Shaver), he would arrange the substitution of Peninsular stock when the merger was completed. Jennings and wife, likewise being trusting souls, endorsed in blank 563 shares of Florida Telephone stock to Shaver. On June 10, 1954, Shaver promptly delivered the Jennings stock certificates to the agent of Mrs. Niccolls. The Niccolls pressure, however, *831 continued and on June 17, 1954, by the device of the same representations as to a proposed merger, Shaver obtained 450 shares of Florida Telephone stock from Stover and wife. The certificates evidencing this stock were likewise endorsed in blank. On the same day Shaver delivered the Stover certificates to the agent of Mrs. Niccolls who had 437 shares transferred on the books of the company to Mrs. Niccolls and the balance of 13 shares transferred to Shaver at his request. As the result of all of this maneuvering Mrs. Niccolls was satisfied. She had her 1,000 shares of Florida Telephone Corporation stock back. Unbeknown to her, however, the stock which she received did not belong to Shaver, because of the fraud outlined above.
Subsequently, the Stovers, apparently becoming suspicious, demanded the return of their 450 shares. Shaver decided to let out the string and permit his kite to fly a little higher. He thereupon approached Pedersen with the same representations as to the merger between the two companies and obtained from Pedersen several certificates of Florida Telephone Corporation stock endorsed in blank. These certificates totaled 450 shares. Shaver then used the Pedersen stock to satisfy the demands of the Stovers and delivered the Pedersen certificates signed in blank to the Stovers.
As would be expected, Shaver's "house of cards" collapsed. His creditors moved in. The eyes of his victims were finally opened. On September 30, 1954, he executed an assignment of all of his assets for the benefit of his creditors. The innocent victims of all of this chicanery very naturally began scrambling for a position of advantage in order to obtain restitution of the assets which had been mulcted from them.
Jennings first filed a complaint for a declaratory decree seeking an adjudication of his rights in the 563 shares which Shaver had obtained from him by fraudulent representation and delivered to Mrs. Niccolls. She was a party-defendant. Shortly thereafter Pedersen filed suit against the Stovers seeking the return of the 450 shares which Shaver had obtained from him and delivered to the Stovers. In this proceeding the Stovers filed a cross-complaint against everybody including Mrs. Niccolls and asked the Chancellor to settle the rights of all parties to the controversy.
The Chancellor properly consolidated both cases for hearing. After considering all of the testimony, the Chancellor decreed in substance as follows: (a) Mrs. Niccolls should return to Jennings and wife the 563 shares which Shaver had fraudulently obtained from them and delivered to her; (b) Mrs. Niccolls should cause to be transferred to Stover and wife the 437 shares which had been transferred to her out of the block of 450 shares fraudulently obtained by Shaver from the Stovers; (c) the Stovers should transfer to Pedersen 450 shares which had been fraudulently obtained from Pedersen by Shaver in order to satisfy the Stovers; (d) Stover and wife were to participate as a creditor under the assignment for the benefit of creditors to the extent of the value of the 13 shares of their stock which had been transferred to Shaver; and (e) Mrs. Niccolls should participate as a creditor under the assignment to the extent of the indebtedness owing to her by Shaver after all creditors of Shaver, Sr. and Shaver & Company were satisfied. The decree further provided that Mrs. Niccolls should account to Jennings and Stover for the dividends received by her while she had their stock and the Stovers should account to Pedersen for the dividends received by them while they held his stock.
Mrs. Niccolls appeals, contending that under the Uniform Stock Transfer Act she was a bona fide purchaser for value and took good title to the stock transferred to her by certificates executed in blank.
The Stovers appeal contending that they were good faith purchasers for value of the Pedersen stock transferred to them by *832 endorsement in blank and that they should not be penalized for the 13 shares but on the contrary the loss on these shares should be borne by Pedersen rather than them.
Everybody seems to contend that Mrs. Niccolls was not entitled to retain the 1,000 shares fraudulently obtained from Shaver's customers and delivered to her.
In fairness to all parties, it should be emphasized that, so far as this record reveals, everybody except Shaver, Sr., acted in absolute good faith. There is no evidence whatsoever that any of these people knew about or in any fashion participated in Shaver's fraud. We, like the Chancellor, are therefore confronted with the problem of applying equitable principles in the settlement of the rights of a group of innocent victims of one who violated their confidence and abused their trust.
In order to obtain reversal, Mrs. Niccolls relies on Sections 614.02 and 614.09, Florida Statutes, F.S.A. She contends that under these statutes she was a bona fide purchaser for value of stock evidenced by certificates endorsed in blank; that she had in no fashion participated in Shaver's fraud, and that as between herself and the original owners of the stock she is entitled to retain the same.
The pertinent portions of Section 614.09, Florida Statutes, F.S.A. (which was adopted from Section 7 of the Uniform Act; 6 Uniform Laws Annotated) are the following:
"(1) If the indorsement or delivery of a certificate,
"(a) was procured by fraud * *, or,
* * * * * *
"(2) If the delivery of a certificate was made
"(a) without authority from the owner, * * *
* * * * * *
"(3) The possession of the certificate may be reclaimed and the transfer thereof rescinded, unless:
"(a) The certificate has been transferred to a purchaser for value in good faith without notice of any facts making the transfer wrongful, * *."
The pertinent provisions of Section 614.02, Florida Statutes, F.S.A. (which was adopted from Section 22 of the Uniform Act), are the following:
"(10) `Value' is any consideration sufficient to support a simple contract. An antecedent or pre-existing obligation, whether for money or not, constitutes value where a certificate is taken either in satisfaction thereof or as security therefor.
"(11) A thing is done `in good faith' within the meaning of this law when it is in fact done honestly, whether it be done negligently or not."
We encounter no difficulty in concluding that Mrs. Niccolls acted in good faith when she accepted the stock certificates from Shaver. Similarly, under the terms of the statute, the antecedent debt from Shaver to Mrs. Niccolls constituted "value" which would serve as the consideration for the transfer. Actually, in the absence of other equities, the position of the appellant Niccolls under the Uniform Stock Transfer Act would appear to be sound. As stated above we are confronted, however, with a contest between a group of absolutely innocent persons, all of whom have been defrauded by the machinations of one unfaithful securities dealer. We are therefore relegated to a consideration of whether the record reflects any circumstances which entitle any of the innocent victims to preferential treatment over the others. When we reach this point we find the appellant Niccolls immediately confronted with the established rule that where one of two innocent parties must suffer through the act *833 of a third person, the loss should fall upon the one whose conduct created the circumstances which enabled the third party to perpetrate the wrong or cause the loss. Reasoner v. Fisikelli, 114 Fla. 102, 153 So. 98. Extended citation of authorities to support this rule is unnecessary.
Applying the rule to the record we are led to a consideration of the original agreement of January 16, 1953, whereby for all practical purposes Mrs. Niccolls put Shaver in business. By the terms of the agreement it was specifically announced that the money value of her 1,000 shares of Florida Telephone Corporation stock was advanced to him in order to enable him to comply with the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq. The agreement obviously was intended to inure to the benefit of the creditors of Shaver because it expressly provided that in the event of any assignment for the benefit of creditors, the claims of creditors generally would have priority over the claim of Mrs. Niccolls represented by the loan. Of more importance was the provision that the agreement was irrevocable, subject however to termination upon the giving of thirty days' written notice to the Regional Office of the Securities and Exchange Commission, and only if the ratio of the indebtedness to the net capital of Shaver as a dealer in securities was within "the then permissible limits of the Securities Exchange Act of 1934". The sum of these requirements was clearly that before Mrs. Niccolls could terminate the arrangement and withdraw the money which she so freely advanced to her unfaithful friend she would have to notify the Securities and Exchange Commission, which under the law is charged with the supervision and control of stock brokers and dealers in securities. Clearly this requirement was inserted in order to forestall the occurrence of exactly what happened in the instant case.
If Mrs. Niccolls had notified the Securities and Exchange Commission when she first made demands upon Shaver for the return of her stock late in 1953, then the regulatory authority of the federal agency would have been called into operation, Shaver's questionable activities undoubtedly would have been revealed and he never would have been in a position to perpetrate the subsequent frauds on the other parties to this unfortunate affair. Moreover, at the outset it was the advance from Mrs. Niccolls that put Shaver into business and enabled him to remain in business. It was through this business operation that he was placed in a position to inspire the public confidence. While obviously not intending to promote Shaver's fraudulent scheme, Mrs. Niccolls' innocent financing of him and cooperation with him clothed his business with an apparent condition of solvency and enabled him to attract the patronage of the public, including the other parties to this cause. See Conrad v. Olds, 110 Ind. App. 208, 37 N.E.2d 297; 141 A.L.R. 788.
The Chancellor therefore ruled correctly in requiring Mrs. Niccolls to return the stock delivered to her together with the dividends acquired by her during the time that she held the stock of Jennings and the Stovers.
As to the relationship between appellee Pedersen and appellee Stover, the situation is quite different. As between these two there are no countervailing equities which entitles one to any preferential consideration over the other. We are therefore relegated to an application of the Uniform Stock Transfer Act. It will be recalled that the Chancellor required Stover to return the 450 shares to Pedersen and simultaneously required Mrs. Niccolls to return to the Stovers 437 shares of the 450 which Shaver had obtained from the Stovers by his fraud. Both Pedersen and the Stovers had endorsed their certificates in blank. The result of the decree was that the Stovers were required to participate as a general creditor under the assignment for the benefit of creditors to the extent of the value of their 13 *834 shares which were lost in the shuffle. When Shaver acquired Pedersen's stock he (Shaver) was already indebted to Stover to the extent of 450 shares. This indebtedness was sufficient to establish "value", or, in other words, a consideration passing from Stover to Shaver when the latter subsequently transferred to the former the 450 shares which he fraudulently acquired from the appellee Pedersen.
By applying the provisions of the Uniform Stock Transfer Act above quoted we are consequently led to the conclusion that if the Pedersen-Stover transaction were isolated, Stover would be entitled to retain the 450 shares which he had acquired from Shaver in good faith, for value, and without notice of Pedersen's interest. Since under the decree Stover will receive 437 shares from Mrs. Niccolls, he will be made whole by retaining only 13 of the Pedersen shares and transferring the balance (437) to Pedersen. Therefore the final decree should have provided that Mrs. Niccolls should transfer the 437 shares to the Stovers; the Stovers should have been directed to transfer 437 shares of the original Pedersen stock back to the Pedersens; the Stovers should not be required to account for accrued dividends on the Pedersen stock for the reason that we have held that they were legally in possession of the stock; since the Stovers have presumably received the dividends on the Pedersen stock while it has been in their possession, Mrs. Niccolls should be required to account directly to Pedersen for any dividends she received on the Stover stock during the period the Pedersen stock was in Stover's possession; finally, Pedersen rather than Stover should have been made a general creditor against the wreckage of the Shaver business to the extent of the value of the missing 13 shares.
We prescribe this rather circuitous "re-routing" of the stock back to original owners, insofar as possible, in order to return to each the stock which he originally had and likewise to simplify the accounting for the dividends which had accrued while he was out of possession of his stock. It is the intent of the opinion to restore each of Shaver's defrauded customers to his original position to the extent that the facts and equity of the situation will permit.
The decree of the Chancellor is therefore affirmed in part and reversed in part and the cause is remanded for further proceedings as may be necessary and the ultimate entry of a decree consistent herewith.
TERRELL, C.J., HOBSON, J., and PEARSON, Associate Justice, concur.