**MID–CONTINENT PAPER CONVERTERS, INC.,**
**Appellant–Defendant,**

v.

**BRADY, WARE & SCHOENFELD, INC., Appellee–Plaintiff.**

No. 89A01–9810–CV–390.

Court of Appeals of Indiana.

Aug. 26, 1999.

Michael E. Brown, David R. Schanker, Kightlinger & Gray, Indianapolis, Indiana, Attorneys for Appellant.

John F. Prescott, Jr., Gerald W. Roberts, Ice Miller Donadio & Ryan, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

ROBB, Judge.

### Case Summary

Appellant–Defendant, Mid–Continent Paper Converters, Inc. ("Mid–Continent"), appeals from the judgment of the Wayne Circuit Court in favor of Appellee–Plaintiff, Brady, Ware & Schoenfeld ("Brady Ware"), on the dismissal of its counterclaim. We affirm that the fraud of Mid–Continent's employee should be imputed to the company and its counterclaim is barred.

### Issues

Mid–Continent raises several issues which we restate as follows:

I. Whether it was clearly erroneous for the trial court to find that the admitted fraud of Mid–Continent's former vice president of finance, Mr. Joseph Gleeson ("Gleeson"), should be imputed to the corporation?; and

II. If imputed, does the fraud operate as a bar to Mid–Continent's counterclaim against Brady Ware?

### Facts and Procedural History

The trial court found that Mid–Continent, a small, closely-held, paper-converting company, retained Brady Ware as auditors in 1990. Gleeson, vice-president of finance for Mid–Continent, was responsible for dealing with Brady Ware in all aspects of Brady Ware's services to Mid–Continent. In order to obtain new bank loans for Mid–Continent's survival, unbeknownst to Brady Ware, Gleeson falsified Mid–Continent's inventory and accounts payable records during each audit year, 1991, 1992 and 1993, which were presented to banking institutions and Brady Ware. In the same period, he also falsely represented to Brady Ware, in writing on behalf of Mid–Continent, that all financial data were fairly reported in conformity with generally accepted accounting principles and that no internal irregularities had taken place. As a result, the audits completed by Brady Ware for Mid–Continent before 1994 were inaccurate. Thomas Hogrefe ("Hogrefe"), President of Mid–Continent, was not aware of Gleeson's fraudulent action until January 1994 when Gleeson told him.

Subsequently, Brady Ware sued Mid–Continent in Wayne County Superior Court for unpaid fees. Mid–Continent counterclaimed that Brady Ware negligently failed to uncover Gleeson's fraudulent alterations of the financial data. Brady Ware moved for summary judgment on Mid–Continent's counterclaim stating that Gleeson's fraud was attributable to Mid–Continent. The court denied the motion finding there was an issue of fact as to Gleeson's exact status with Mid–Continent in deciding whether the fraud should be imputed to the corporation. The action was afterwards transferred to the Wayne Circuit Court. The Wayne Circuit Court then bifurcated the trial with the issue of imputation of fraud to be heard first and, then the complaint for the fee. Before proceeding to trial, the court ruled that the Indiana Comparative Fault Act was not applicable to Mid–Continent's counterclaim.[1] In response to the request by Brady Ware, the trial court entered findings of fact, conclusions of law and entered final judgment in favor of Brady Ware and against Mid–Continent on its counterclaim. In particular, the court issued the following pertinent findings of fact and conclusions of law:

### FINDINGS OF FACT

. . . .

59. Gleeson's actions of falsifying Mid–Continent's accounts payable and inventory records did in fact benefit Mid–Continent because Mid–Conti-

---

1. The record does not show the trial judge's reasoning on the applicability of the Indiana Comparative Fault Act. According to Brady Ware's brief on the applicability of Indiana's Comparative Fault Act to the counterclaim, the Indiana Comparative Fault Act before 1995 did not cover intentional acts under the definition of "fault" set forth in Indiana Code Section 34–4–33–2(a). The Act was amended in 1995 to include intentional conduct in the definition of fault. See Ind.Code § 34–6–2–45(b). Brady Ware thus argued that the amendment should not be applied retroactively to this case which was brought in 1994. We herein leave it open whether the Indiana Comparative Fault Act, after being amended to encompass intentional torts, could be applicable to future suits against auditors.

nent was able to obtain new financing based thereon.

60. Gleeson's fraudulent actions were committed within the course and scope of his agency as an employee, officer and member of the Board of Directors of Mid–Continent.

. . . .

62. Gleeson's fraudulent conduct was not limited to fraudulent representations contained in falsified business records as provided to banking institutions and Brady Ware, but also included the independent fraudulent act of signing the false representation letters which he provided to Brady Ware.

. . . .

### CONCLUSIONS OF LAW

. . . .

12. The fraud perpetrated by Gleeson against Brady Ware is imputed to Mid–Continent because Gleeson committed fraud on behalf of Mid–Continent while in the scope of his employment. Therefore, the fraud committed by Gleeson is the fraud of Mid–Continent.

. . . .

14. Since Mid–Continent committed fraud against Brady Ware, Mid–Continent cannot recover damages from Brady Ware. Brady Ware is also a *victim* of the fraud committed by Mid–Continent.

. . . .

(R. 442–47) (emphasis in original). Mid–Continent now appeals.

### Discussion and Decision

#### I. Standard of Review

■■■ Mid–Continent asks us to reverse the trial court's judgment because its specific findings of fact and conclusions of law were clearly erroneous. As an appellate tribunal, we do not set aside the trial court's judgment "unless clearly erroneous." Indiana Trial Rule 52(A). When a trial court has made special findings of fact, its judgment is clear-ly erroneous only if: (i) its findings of fact do not support its conclusions of law or (ii) its conclusions of law do not support its judgment. *Estate of Reasor v. Putnam County*, 635 N.E.2d 153, 158 (Ind.1994). Findings of fact are clearly erroneous only when the record contains no facts to support them either directly or by inference, and the judgment is clearly erroneous if the court applies the wrong legal standard to properly found facts. *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind.1997). To determine that the trial court's findings or conclusions are clearly erroneous, an appellate court's review of evidence must leave it with the firm conviction that a mistake has been made. *Id.*

In this case, Mid–Continent specifically challenges the findings that Mid–Continent was enriched by Gleeson's fraud and Gleeson was a member of top management. However, as we discuss below, Mid–Continent fails to meet its burden of proving that such findings of fact were clearly erroneous.

#### II. Imputation of Fraud

##### A. Indiana Agency Law

■■■ It is well established that the actions of employees and agents of a corporation are attributable to the corporation, when the actions are done within the scope of employment. *Bud Wolf Chevrolet v. Robertson*, 519 N.E.2d 135, 137 (Ind.1988). Thus, a principal is liable for any misrepresentations of his agent undertaken within the scope of the agency, whether or not the principal has knowledge of the fraud. *Bischoff Realty v. Ledford*, 562 N.E.2d 1321, 1324 (Ind.Ct.App. 1990). This rule is grounded in the sound policy that it is preferable to place the burden of an agent's fraud on the principal rather than on an innocent third party to the agency relationship. *Id.* Moreover, allowing principals to accept the benefits of their agents' fraudulent transactions without liability for the fraud could lead to an increase in such transactions and reduce incentives to hire honest managers and monitor their behavior. *Id.*

■■■ On the other hand, if an agent commits an independent fraud for his own benefit, he ceases to act as an agent for his principal. *See Husted v. McCloud*, 450

N.E.2d 491, 494 (Ind.1983); *see also Home Elec. Light & Power Co. v. Collins,* 31 Ind. App. 493, 66 N.E. 780 (1903) (holding that if the employees made fraudulent representations for their own interest, the corporation is not liable for the damage). An agent's knowledge will not be imputed to the principal, where the agent's conduct raises a presumption that the agent would not communicate his knowledge. *Vincennes Savings & Loan Ass'n v. St. John,* 213 Ind. 171, 12 N.E.2d 127, 130 (1938); *see also Conrad v. Olds,* 110 Ind.App. 208, 37 N.E.2d 297 (1941) (holding that the agent's knowledge will not be imputed to the principal if the agent acts in the adverse interest of the principal). Such circumstances, as quoted by the court, include "where the communication of such a fact would necessarily prevent the consummation of a fraudulent scheme which the agent was engaged in perpetrating, or when the person claiming the benefit of the knowledge or notice or those whom he represents collude with the agent to cheat or defraud the principal." *Vincennes Savings & Loan Ass'n,* 12 N.E.2d at 130.[2] Thus, an employer will not always be liable for the actions of its agent.

### B.  Analysis

A question arose in a suit by a corporation against its auditor relating to fraud by the corporate employees and the subsequent failure on the part of the auditor to detect it.  In *Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449 (7th Cir.1982), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982), the firm's top management was involved in a fraudulent scheme whereby inventories were inflated far above their actual value in order to increase the apparent worth of Cenco and thus increase the market price of its stock. Cenco therefore was able to borrow money at lower rates and made insurers pay inflated claims for inventory lost or destroyed.  Subsequently, the stock purchasers filed a suit against Cenco and Seidman & Seidman (the auditor) for violations of federal securities laws.  In determining whether the fraud could be a defense to Cenco's cross-claim against Seidman & Seidman, the Seventh Circuit set forth a distinction between "fraud on behalf of the corporation" and "fraud against the corporation." *Id.* at 455. The court concluded that, rather than stealing from the company, the fraud permeating the top management turned Cenco into an "engine of theft," which caused widespread harm to outsiders. *Id.* Under the policy objectives of tort liability, compensating the victims and deterring future wrongdoing, the court held that Cenco should not be allowed to shift the entire responsibility for the fraud to its auditors. *Id.* at 454–55.  It is noteworthy, however, that the court left undecided the issue of whether an auditor will never be liable for the fraud of company employees that the auditor could have detected and prevented by using reasonable care.[3] *Id.* at 455.

Mid–Continent argues that the court in *Cenco* looked to three factors in determining whether a malpractice suit against the auditors would be precluded because of imputation of fraud: (1) whether the company benefitted from the fraud, (2) whether members of top management were involved in the fraud, and (3) whether the plaintiffs suing the auditors were involved in the fraud.[4]  Mid–Continent argues that in the present case the

2.  In this case, there is nothing in the record showing Gleeson's conduct can raise a presumption that he would not tell other executive personnel of Mid–Continent about the fraud.  On the contrary, the findings of fact indicate that Gleeson himself told Hogrefe in January 1994 that he provided false information to Brady Ware.

3.  The Fifth Circuit Court took a similar position in *Federal Deposit Insurance Corp. v. Ernst & Young,* 967 F.2d 166 (5th Cir.1992).  In that case, the Federal Deposit Insurance Corporation ("FDIC"), as assignee of Western Savings Association ("Western"), sued Ernst & Young ("EY") for Western's financial loss caused by its reliance on EY's faulty audit.  The Fifth Circuit affirmed the trial court's holding that FDIC could not prove the causation issue because the knowledge of the fraud by Western's owner was imputed to the company and thus Western did not rely upon the audits.  The Fifth Circuit also cautioned that they did not hold an auditor was never liable to a corporation when a corporation's employee or agent acts fraudulently on the corporation's behalf. *Id.* at 172.

4.  We will address the first two criteria submitted by Mid–Continent.  The "plaintiffs" referred to in the third criteria are Mid–Continent itself in this case.  It is irrelevant for Mid–Continent to argue that Hogrefe, the sole shareholder and the executive manager, did not participate in the fraud.

evidence does not support the findings that Mid–Continent benefitted from Gleeson's fraudulent misrepresentations nor that Gleeson was a member of top management. Thus, Mid–Continent contends that the findings of fact do not support the conclusion that Gleeson's admitted fraud should be imputed to the company and the counterclaim against Brady should be dismissed.· We do not agree with Mid–Continent's arguments.[5]

### 1. Benefits Received by Corporation

In a case of fraud by the employee on behalf of a corporation, the issue of whether the company benefits from the employee's fraud can be complicated in two situations. A "loyal but misguided" employee who intended to benefit the corporation by his fraudulent acts and did produce a short-term benefit may ultimately cause real damage to the company, even before the fraud is unmasked. Second, the employee may also have his own interest while the employee's fraud serves the interest of the corporation.

The former problem was dealt with in *Seidman & Seidman v. Gee*, 625 So.2d 1 (Fla.App.1992), where an insurance company's controlling officer inflated the value of the company by fraudulently representing that the company was backed by a $10 million certificate of deposit to obtain licensing for operation. The insurance company eventually went into liquidation, and the liquidators sued the accounting firm for failure to discover the officer's fraud. In discussing whether the officer's wrongful act was adverse to the corporation's interest, the court endorsed a short-term/long-term benefit analysis. The court held that the ultimate financial demise of the insurance company was not determinative, but rather the short-term benefit or detriment to the company. *Id.* at 3 (citing *Security America Co. v. Schacht*, No. 82–C–2132 (N.D.Ill.1983)).[6]

The latter potential problem was analyzed in *In re Crazy Eddie Securities Litigation*,

802 F.Supp. 804, 817 (E.D.N.Y.1992). The court stated that the adverse interest exception does not release a principal from liability when the agent acts both for himself and for the principal even if his primary interest is inimical to the principal. Thus, the court held that a corporation must prove that its employees abandoned the corporate interest and acted entirely to further their own interest in order that the fraud not be imputable.

Furthermore, it is important to note that the Restatement of Agency does not require that a principal receive benefits as a prerequisite to the imputation of the agent's fraud. The Restatement (Second) of Agency § 261 (1957) provides:

> A principal who puts a servant or other agent in a position which enables the agent while apparently acting within his authority to commit a fraud upon third persons, is subject to liability to such third persons for the fraud.

Comment (a) to this section suggests the reason for this rule:

> The principal is subject to liability under the rules stated in this section *although he is entirely innocent, has received no benefit of the transaction, and ... although the agent acted solely for his own purpose.* Liability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person, the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him.

(Emphasis added).

Therefore, we do not find that the enrichment of the corporation is a dispositive element. Rather, a finding that the agent or employee acts on the corporation's behalf and within the scope of authority are more relevant criteria in determining if an employee's fraud is imputable.

---

**5.** We should indicate that the brief of Brady Ware was not presented in a spirit of collegiality between appellate counsel. We are not impressed by name-calling remarks. They add no merit to Brady Ware's argument and demonstrate a lack of professionalism not condoned by this court.

**6.** Mid–Continent objects that the analysis in *Gee* is applicable to this case because the alleged detriment suffered by Mid–Continent occurred while the fraud was ongoing, not after the fraud was unmasked as it was in *Gee*. In spite of this argument, as we discuss later, the trial court was not clearly erroneous to conclude that Mid–Continent benefitted from Gleeson's fraud based on the findings of fact.

■ In this case, Mid–Continent has failed to prove that it was clearly erroneous for the trial court to find that Mid–Continent benefitted from Gleeson's falsified financial data and misrepresentations. Although Mid–Continent suggests that it would have been able to find qualified financing from other resources absent Gleeson's fraud, and that Gleeson's fraud did not produce benefits but caused underpricing and resulted in insufficient revenues to meet costs, the evidence shows that Gleeson succeeded in procuring a replacement lender for Mid–Continent, fulfilling the very purpose of Gleeson's fraud. Gleeson believed that the provision of inaccurate information to banking institutions was necessary for the survival of the company. The record also contains evidence that Mid–Continent would have violated restrictive covenants with their lender but for Gleeson's financial manipulations. Accordingly, the court's conclusion that Gleeson's fraudulent conduct was intended to and did benefit Mid–Continent was not clearly erroneous.

### 2. Top Management

Mid–Continent contends that Gleeson's acts cannot be identified with the company because the trial court erred in finding that Gleeson was a "top management" employee. Again, we disagree.

■ The position the employee who committed fraud holds in a ranking of employees is a factor in deciding whether he acts "for the corporation" or "against the corporation." The Seventh Circuit, in *Cenco*, noted that "the lower down the employee is in the company hierarchy, the less likely he is to commit fraud for rather than against the company." 686 F.2d at 456. The court noted that there are "overzealous employees at every level" who commit fraud and thought they were acting in the best interest of the company. *Id.* Thus, we find that it is not a requirement that the employee be top management in order to impute fraud, although the employee's position in the company is certainly a factor in analyzing whether the fraud will be attributable to the corporation. In the present case, it is clear that Gleeson had the ability to act for Mid–Continent in dealing with the corporate financial matters. The record indicates that Gleeson was vice-president of finance and chief financial officer of Mid–Continent until March of 1994, was a member of the board of directors, was held out as being one of the four key personnel of Mid–Continent, handled most of the finances, and was in charge of the books and records. The court also found that Gleeson had both the actual and apparent authority to deal with Brady Ware in all aspects of the auditors' service. Although Gleeson was not a shareholder nor a business decision-maker, we believe that his position or authority sufficiently enabled him to act on behalf of Mid–Continent and thus his fraud should be attributed to the company.

### III. Imputation of Fraud as a Bar to Suit

The last question is whether the trial court erred in dismissing Mid–Continent's malpractice charges against Brady Ware after deciding that the fraud is imputed to the company.

Mid–Continent counterclaimed that as a result of Brady Ware's negligence in performing the auditing service, the fees paid by Mid–Continent were unearned and of no value, and the company had to engage another consultant's service to reestablish its financing program. Mid–Continent also alleged that its relationship with suppliers and bankers had been harmed with a devastating impact on its operations in 1994 because of Brady Ware's failure to discover Gleeson's fraud.

■ While some courts have held that the imputation of fraud to a corporation is an *absolute* defense to its action against an accounting firm for negligent failure to discover fraud, *see Seidman & Seidman*, 625 So.2d at 3, as a matter of law, we do not necessarily agree that the imputation of fraud is an absolute defense to malpractice claims against auditors under all circumstances. Such a holding could possibly exonerate auditors from all liabilities stemming from failure to detect and prevent fraud when it was possible to do so. Clearly, auditors should not excuse themselves from their duty by reason of the fraud which they may be able to detect under applicable professional standards. "Auditors are not detectives hired to ferret out fraud, but if they chance on signs of fraud they may not avert their eyes—they must investigate." *Cenco*, 686 F.2d at 454.

In this case, the findings of fact indicate that Gleeson's fraudulent conduct was not limited to falsifying business records presented to banks and Brady Ware, but also included the independent fraudulent act of signing the false representation letters which he provided to Brady Ware. Mid–Continent stated in these representation letters that they were responsible for the fair representation in the financial statements and there were no irregularities involving management or employees who have significant roles in the internal structure. The court found that Brady Ware was entitled to rely and did rely on the truthfulness of these representation letters presented by Hogrefe and Gleeson on behalf of Mid–Continent. The record also shows that Gleeson was the intermediary person who would contact individual customers and financial institutions to help auditors resolve any discrepancies or variances discovered in auditing process. Mid–Continent does not dispute any of these facts. We thus conclude that it is not clearly erroneous for the trial court to find that Brady Ware is also a victim of the fraud committed by Gleeson on behalf of Mid–Continent and that Mid–Continent cannot recover damages from the victim of its fraud. Accordingly, we affirm the trial court's conclusion that its counterclaim should be barred.

### IV. Conclusion

In conclusion, we affirm the trial court's decision that the fraud by the chief financial officer is imputable to Mid–Continent and that Mid–Continent's counterclaim is barred. We narrow this decision to the facts of this case: the chief financial officer committed the fraud on behalf of the company, which was intended to benefit the company and did benefit the company, and the auditors had a right to and did in fact rely on the perpetrator's fraudulent misrepresentations.

Affirmed.

SHARPNACK, C.J., and DARDEN, J., concur.